REVERSED AND REMANDED.

**Dan AMBROSINO, Stephen J. Burns, and Steve R. Chura, et al., Plaintiffs–Appellants,**

v.

**RODMAN & RENSHAW, INCORPORATED; Rodman Properties, Limited, formerly known as Rodman Capital Group, Limited; and Richard E. Rice; et al., Defendants–Appellees.**

Nos. 90–3769, 91–1441.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 13, 1991.

Decided Aug. 11, 1992.

James S. Barber, Allen B. Witz, Arvey, Hodes, Costello & Burman; John J. Enright, Horvath, Lieber & Quilici; and David A. Novoselsky (argued), Novoselsky & Associates, Chicago, Ill., for plaintiffs-appellants.

Ira Gould, Victoria Zielinski, Holleb & Coff; Brian J. Wanca, Robert Bell, Jr., John W. Emerson, Johnson & Bell; Robert D. Glick, Ira S. Kolb, Franklin S. Schwerin (argued), Schwartz, Cooper, Kolb & Gaynor; and John J. Harte, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, WOOD, Jr.,\* and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case is about oil-and-gas investors in 1981 and 1982, the plaintiffs-appellants here, who are not satisfied with the tax benefits their investment of $2,340,000 procured; it is about alleged violations of federal and state securities laws; and it is about money. It is about a promoter, defendant Richard Berry,[1] who, according to the district court, failed to reveal a material fact that a reasonable investor would consider important and, thus, was held liable for $1,840,000. It is also about a securities dealer, Rodman & Renshaw, Inc., and some of its employees (collectively, the "Rodman defendants")[2] that, according to the district court, are free of liability because in selling three oil-and-gas, limited partnerships they either did not fail to dis-

---

\* Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case.

1. Richard Berry is among the captioned defendants-appellees but did not appear before this court.

2. Of the captioned defendants-appellees, only the Rodman defendants, comprising Rodman & Renshaw, Inc., Rodman Properties Ltd., Richard Rice, and Allan Berggren, appeared before this court.

close material facts, did not make material misrepresentations, or exercised due diligence although failing to discover a material fact. Because the district court did not misunderstand the applicable law, was not clearly erroneous in its findings of fact, and did not abuse its discretion, we affirm its judgment.

The early 1980s in the oil fields: they were the best of times, they were the worst of times.[3] Everyone knew the price of oil and gas had increased many times over in just a few years, and many believed it would continue to do so, to the betterment of some and the detriment of others. Many also believed that drilling activity, which had similarly mushroomed, would continue to do likewise. But there was concern among some petroleum experts that domestic reserves would steadily decline while both production and the cost of exploration steadily increased.[4] Experienced oilfield workers were making and spending more than some corporate executives. Recent college graduates who could claim to be geologists, geophysicists, or petroleum engineers were making more, commonly much more than the professors who taught them. Price controls, divestiture, deregulation, where to drill, and where not to drill were hotly debated topics. The northern and eastern regions of the country, particularly, suffered brownouts, shortages of natural gas and home heating oil, and severe restrictions on energy consumption.

No one suspected that a major financial player, Penn Square Bank, in Oklahoma City would go under—July 5, 1982—or that the associated ripple, which for some was more a tidal wave, would ravage the financial and petroleum industries alike, nearly sinking Continental Illinois National Bank & Trust Co. of Chicago and putting many banks and savings and loan associations, as well as numerous oil and oil-support companies, out of business.[5] Nor did anyone anticipate that in just a few years the price of a barrel of oil would drop precipitously, as would both the number of active drilling-rigs and the number of wells drilled.

But no one saw the approaching storm or paid any heed to those who said they did; money continued to flow freely. Investors were everywhere, throwing money at anyone who claimed to be an oil or gas promoter, whether he or she had been in the business for decades or days. Many promoters were both knowledgeable and honest, earning a living, albeit a very comfortable one, by developing legitimate oil and gas prospects, using their own and investors' money. Sometimes these prospects were extremely successful with everyone's investment multiplying many times over in less than a year or so. Sometimes the payout was less or took longer, but still the investment was pleasingly profitable. Sometimes the prospect, through no one's fault or fraud, was a bust; still there were handsome tax benefits. But there was another type of promoter, too.[6] These promoters sold mostly illusory dreams; their prospects, if drilled at all, produced mostly salt water—a product for which the market was severely depressed—and tax benefits, a not entirely unwelcome result. Investors and the securities dealers who marketed the investments were hard pressed to distinguish honest promoters from the others, the legitimate prospects from the fraudulent ones, and the prospects that failed

---

**3.** For an expansive account of this traumatic epoch, see DANIEL YERGIN, THE PRIZE: THE EPIC QUEST FOR OIL, MONEY, AND POWER 694–755 (1991), describing how international politics, economic forces, and business decisions, among other factors, interacted to run the contract price of crude oil above $34 per barrel and the spot price to $50 in 1981, then to drive the contract price below $10 per barrel and the spot price below $6 in 1986.

**4.** See, for example, John D. Haun, Future of Petroleum Exploration in the United States, 65 AM. ASS'N OF PETROLEUM GEOLOGISTS BULL. 1720 (1981); Plaintiff's Exhibit No. 5.

**5.** See YERGIN at 732. Also, as Fate would have it, the second and largest of the three disputed partnerships, in terms of number of investors and funds invested, obtained letter of credit loans from Penn Square. With the collapse of Penn Square, they were sold to Continental Illinois.

**6.** See, for example, Ted Hughes, Dallas Authorities Say 1982 Will be a Good Year for Oil and Gas Scams, DALLAS/FORT WORTH BUSINESS, Jan. 11, 1982, at 7–8: Plaintiff's Exhibit No. 98a.

fairly from those that were foreordained to fail.

This is a securities case; it is not about oil or gas other than as the stage upon which the drama unfolds. Nonetheless, to understand the materiality of many of the facts raised by the plaintiffs-appellants as evidencing violation of the securities laws it is necessary to know a bit about both the geology of oil and gas and the petroleum industry.

Almost all of the world's economically recoverable oil and gas occurs in sedimentary rocks, mostly in sandstones and limestones.[7] These rocks originally formed as pods, or stringers, or ribbons, or finite sheets of sediment, deposited more or less in horizontal layers that upon lithification became the sedimentary strata we see exposed, for example, in many roadcuts and the Grand Canyon. These strata are not uniform in composition, texture, thickness, or extent, and certainly not in the amount and type of cement or other lithification products that bind the sedimentary grains together. Furthermore, upon burial and as the result of tectonic movements, the strata become deformed: they may be tilted, folded and faulted. Consequently, inhomogeneity is the rule, not the exception. It is this inhomogeneity that both traps oil and gas and limits its occurrence to rather unique settings.[8]

Oil and gas, if generated in the first place and if present at all, occur in pores in the strata, in holes or fractures of one sort or another mostly smaller than the naked eye can distinguish. The more porous a rock is, the more oil and gas it can contain. But to get the oil or gas out, the rock must be permeable; fluids must be able to flow from the strata into the well. The natural inhomogeneity of sedimentary strata means no single stratum is uniformly porous and permeable, nor, if oil- or gas-bearing, will it be uniformly oil- or gas-bearing. Nonetheless, earth scientists have developed techniques and an ability to identify likely locations for the presence of oil and gas, albeit with far less than perfect accuracy. The earth holds many surprises for even the most honest and insightful earth scientist.

Perhaps in spite of or, perhaps, because of the nature and occurrence of its product, the petroleum industry has become a mainstay of the modern world's economy. It is an integrated industry, comprising five basic functions: exploration, production, refining, transportation, and marketing.[9] Our concern is mostly with exploration and, to a lesser extent, production. Transcending these two functions is development. It is a subset of both exploration and production and occurs only after discovery (successful exploration). While preceding most production, it also often accompanies at least the early stages of production.

Pure exploration is a risky venture.[10] The rank, or newfield, wildcat is the riskiest of the legitimate exploration ventures, constituting an attempt to discover petroleum in a potentially possible site in a region where none has been produced but where its absence is not foreordained. The ordinary wildcat is somewhat less risky with an industry-wide success ratio of about 1 in 9 or 10 for finding petroleum, whether economically producible or not; it tests an unproven but possible location in a region known or reasonably thought to contain petroleum. The least risky but still uncertain exploration venture is the step-out, an attempt to discover a new, nearby oil- or

7. For a more extensive overview, see, for example, Frank Press and Raymond Siever, Earth 574–88 (1988). For greater detail, see Parke Dickey, Petroleum Development Geology (1986); G.D. Hobson and E.N. Tiratsoo, Introduction to Petroleum Geology (1981); and Richard C. Selley, Elements of Petroleum Geology (1985).

8. Selley at 219–75 offers a particularly thorough discussion of reservoir rocks, and Hobson and Tiratsoo at 91–99 succinctly summarize the salient attributes of reservoir rocks. Hobson and Tiratsoo at 100–42 and Selley at 276–331 describe the numerous types of traps in which petroleum may accumulate and from which it may ultimately be produced.

9. For one major oil company's view of the petroleum industry and how it functions, see British Petroleum Co. Ltd., Our Industry: Petroleum (1977). Also, see Selley at 1–12.

10. See Hobson and Tiratsoo at 264–68 and Selley at 411–24.

gas-pool or to examine a previously untested horizon above or below a producing or formerly producing interval.

Once oil or gas is discovered, the field or pool must be developed if hydrocarbons are to be produced in economically meaningful amounts. Development involves both drilling to determine the external limits of the occurrence and drilling to establish a pattern of wells that will maximize ultimate recovery.[11] The former, sometimes referred to as outpost or extension drilling, is dominantly an exploration function; whereas, the latter is mostly a production function. Neither is without risk: the former, however, is generally riskier than the latter. Some holes drilled to test the limits of an occurrence must necessarily fall outside the area of producible hydrocarbons or lose production before achieving payout. Infield drilling may encounter impermeable or low-porosity zones from which oil or gas cannot be produced, possibly because of differential cementation or a facies change; unanticipated faults may have disadvantageously displaced the producing interval; or the producing interval may unexpectedly pinch-out beneath or onto an unconformity. Uncertainty is always present.[12]

Lastly, production is generally quite predictable but not entirely so. Essentially all oil wells, once they are on-line, are most productive very early on: generally, this is during their first few weeks or, at most, months of operation.[13] Production rates naturally decline toward zero after the initial spurt, with the rate of decline depending on the characteristics of the reservoir. This decline happens, in part, because as production continues oil must flow farther to reach the well and the reservoir pressure driving that flow decreases. Also loose, sedimentary grains may migrate with the oil into and partially plug pores near the well bore, constricting flow and reducing flow rates. Ultimate recovery volumes and, to some extent, production rates can be increased by employing various enhanced, or secondary, recovery techniques.[14] Gas may be injected into gas-drive reservoirs, and water, commonly excess formation water, may be injected into water-drive reservoirs. On the other hand, if a well is produced too rapidly, water from beneath the oil layer may enter the well and block further entry of oil, or dissolved gas may come out of solution too soon, depriving the reservoir of much of its drive. Also, the local, national, and world economies markedly affect whether a well is productive or not.

In the early 1980s oil-and-gas, limited partnerships were greatly favored by investors if for no other reason than their being lucrative tax shelters. The tax laws were such that, depending on the nature of the program, an investor could take more in tax credits and write-offs in the first year or two than had been invested. Thus, even if the prospect failed totally, the limited partner would lose less than a comparable investor in stocks or commodities, for example. The government, of course, would more than recoup these dollars if the prospect paid off. Commonly, limited partnerships denominated "year end" were sold purely as tax shelters with little or no real expectation of a return other than the inherent tax benefits. Limited partners, moreover, were not exposed to the numerous and varied types of liability that the general partners were. Limited partners were precluded from participating in any decision-making or operational aspects of the partnership, unless, of course, they wished to take on exposure to the liability

11. *See* DICKEY at 496–517.

12. In 1980, for example, 2660 of the 4172 onshore exploratory wells drilled in Texas were dry (54%), 302 of the 508 drilled in Oklahoma were dry (59%), and 361 of the 444 drilled in Illinois were also dry (81%). Similarly, 2567 of the 14,359 onshore developmental wells drilled in Texas were dry (21%), 1984 of the 8533 drilled in Oklahoma were dry (23%), and 525 of the 1535 drilled in Illinois were dry (34%).

Robert D. Johnston, *Drilling Activity in North America During 1980,* 65 AM. ASS'N OF PETROLEUM GEOLOGISTS BULL. 1728, 1740 (1981); Plaintiff's Exhibit No. 5.

13. *See* DICKEY at 401–22 and HOBSON and TIRATSOO at 308–13.

14. *See* DICKEY at 423–95 and HOBSON and TIRATSOO at 313–17.

from which they were otherwise shielded. Thus, the oil-and-gas, limited partnership was fundamentally a hands-off, sit-back-and-watch, money-in, money-out investment. These limited partnerships were widely viewed as win-win situations. Sometimes, though, this did not happen.

### FACTS

The plaintiffs-appellants here invested in up to three oil-and-gas drilling, limited partnerships sold by the Rodman defendants: the PEXCO 81–1 Drilling Program ("81–1"), the PEXCO 81–Year End Drilling Program ("81–Year End"), and the PEXCO 82–2 Drilling Program ("82–2"). The plaintiffs purchased interests in the programs either by paying 100% up front or by paying 10% down in cash and providing letters of credit against a loan for the balance. None of the drilling programs turned a profit; all lost money, and the letters of credit were drawn down. The Rodman defendants point out, however, that "the plaintiffs reduced their income taxes for the years in which they purchased their investments in multiples of their cash contributions ranging from 1.48 to 4.69."

The programs were not atypical: each described what the general partner, William J. Pitts Enterprises, Inc., "intended" or "expected" to do, the general nature of the proposed prospect or prospects, and what might or might not occur. The general partner expressly retained the right to make modifications and adjustments in the program. Each private placement memorandum, denominated a "confidential memorandum" or "confidential private placement memorandum," clearly stated on its cover that the security was not registered and that it involved "A HIGH DEGREE OF RISK." All three memoranda also contained summary to extensive discussions under the following topic headings, among others: Summary of Offering; Definitions; Participation in Costs and Revenues; Terms of the Offering; Proposed Activities; Risk Factors; and Tax Aspects. These last two topic headings always captioned the lengthiest discussions.

Nine of the plaintiffs invested a total of $300,000 in the 81–1 program, which closed on June 1, 1981. The 81–1 memorandum described drilling prospects in Caldwell, Burleson, and Nolan Counties, Texas, and stated the general partner intended to drill only developmental, not exploratory wells. The Austin Chalk Formation and the Buda Limestone Formation were identified as intended objectives in Caldwell County. "Developmental acreage" was defined as "acreage on which a well is drilled to a known producing formation in a previously drilled field or adjacent to a previously drilled field." This definition is not the one published by the American Association of Petroleum Geologists ("AAPG") and was so noted in an amendment incorporated in the front of the memorandum.

The first hole drilled was in the Schuch prospect in Coke County, Texas, about thirty miles north of San Angelo. The prospect had not been identified in the 81–1 memorandum. The partnership expended one-third of the available drilling funds on the well, which was a dry hole. Eight wells were then drilled into the Austin Chalk Formation at a site in Caldwell County, east of San Antonio and south of Austin; they were on-line by December 1981. Although production dropped to a few barrels per day after six months or so and oil prices declined, these wells produced over $1,000,000 in revenue. Two dry holes were drilled in Kansas in January 1982, and the letters of credit were drawn down in July 1983.

All twenty-nine plaintiffs, including the nine who had participated in the 81–1 program, invested a total of $1,840,000 in the 81–Year End program, which was marketed as a year-end tax shelter and closed on December 28, 1981. This closing date did not leave the general partner time, under the circumstances, to secure a site and commence drilling, let alone complete a well in 1981; nonetheless, tax benefits accrued for the 1981 calendar year. The memorandum indicated the partnership intended to drill 80% developmental wells and 20% exploratory wells but did not identify any prospects, noting, instead, that its operations might "be conducted in any

state...." It also indicated that three wells from a 1980 program, denominated 80-1, had been drilled but that no production data were available because division orders had not been published by the Texas Railroad Commission, the state agency that oversees oil and gas operations. This latter statement was erroneous on two counts: first, division orders are not the source of production data and, second, the data were available from the Railroad Commission. Richard Berry, a "geological consultant" doing business as Berry Petroleum Consultants in Dallas, Texas, actively participated in selecting the prospect and personally sold units of the 81–Year End program. The offering did not disclose, however, (1) where the partnership intended to drill, (2) that a waterflood project— secondary recovery via water injection— was contemplated, (3) that Berry had participated in selecting the site, or (4) that Berry had a leasehold interest in the prospect selected. The memorandum did disclose that affiliates of the operator might hold title to some leases, but it did not state that Berry was an affiliate of the operator, nor did it otherwise identify him.

In February 1982 the 81–Year End partnership started drilling to develop a waterflood project in the Ranger Sand of the Pritchard Field,[15] Stevens County, Texas, about halfway between Abilene and Ft. Worth. This field first produced oil in the 1920s and was but one of many, similarly aged fields widely considered ripe for reactivation using secondary recovery techniques. Natural gas was detected in some of the zones encountered; thus, the waterflood project was deferred, and the holes were put on-line as gas wells. They produced about $100,000 in revenue before turning poisonous, producing sour, $H_2S$-bearing gas in September 1983. The purchaser refused further delivery of gas; thus, the wells were taken off-line and either shut-in completely or plugged with respect to the zones producing sour gas. Gas production, however, had declined significantly by late 1982; thus, the partnership started up the waterflood operation in

January 1983. Waterflooding continued into September of that year when fresh water unexpectedly broke through the oil column in two low-productivity wells. It was then "discovered" that a waterflood operation had been conducted in the field in 1961. Berry resigned in December 1983, the status of the program was reported, and operations were terminated. The letters of credit were drawn down July 1984.

The district court found that defendant Berry "knew or should have known about the previous waterflood because it was his land and because he is a petroleum engineer." *Ambrosino v. Rodman & Renshaw, Inc.*, No. 84 C 4586, memorandum opinion and order at 19, 1990 WL 129564 (N.D.Ill. Aug. 30, 1990, *amended* Nov. 13, 1990). The omission was material. Consequently, the court found Berry and Berry Petroleum Consultants liable under section 12(2) of the Securities Act of 1933 and awarded the plaintiffs $1,840,000 in damages. 15 U.S.C. § 77*l* (2). Conversely, the Rodman defendants were found not liable because, although they failed to discover and, thus, disclose the 1961 waterflood, they had exercised due diligence in investigating the 81–Year End program.

Two plaintiffs, both of whom had participated in the 81–Year End program but not the 81–1 program, invested a total of $200,-000 in the 82–2 program, which closed on October 23, 1982. Before the sale of the 82–2 program, Robert Burr, the owner of Lincoln Drilling Co., the drilling contractor for the other PEXCO programs at issue here, had been indicted for fraud, but this was not reported in the 82–2 memorandum. The offering did state that the program intended to purchase a 25% working interest in six Kansas prospects and that it would employ a new geochemical technology, known as the Barringer Process. It did not state that William J. Pitts and John J. Harte, the two principals of the general partner, William J. Pitts Enterprises, Inc., and Francis L. Kirby, a senior vice-president and registered representative of Rodman & Renshaw, had financial interests in that process; neither did it disclose any

---

**15.** Also known as the Pritchard lease.

problems the previous programs had experienced.

Petro Dynamics Ltd. replaced Lincoln Drilling as the drilling contractor. The Kansas prospects were drilled, unsuccessfully, at least from the investors' point of view. The 82–2 partnership then drilled in Colorado and Indiana and acquired interests in a large number of smaller wells, although none of this activity had been identified in the memorandum. A few of the 82–2 wells produced some oil and gas, but not in commercial quantities. The letters of credit were drawn down June 1984.

## ANALYSIS

The plaintiffs' civil cause of action stated claims under section 12(2) of the Securities Act of 1933 (the "1933 Act"), section 17 of the 1933 Act, section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), Rule 10b–5 of the Securities and Exchange Commission, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 15 U.S.C. §§ 77$l$(2), 77q, 78j(b); 17 C.F.R. § 240.10b–5; 18 U.S.C. §§ 1961 *et seq.* The plaintiffs also raised state-law claims under the Illinois Securities Law of 1953, the Florida Securities Act, and the common law of both Illinois and Florida. ILL.REV. STAT. ch. 121½, ¶ 137.1 *et seq.;* FLA.STAT. ch. 517.01 *et seq.* The district court had jurisdiction over the federal-law claims (28 U.S.C. § 1331) and exercised pendent jurisdiction over the others. The court entered its judgment and order on August 30, 1990, and amended it November 13, 1990. The plaintiffs timely filed their notice of appeal, notwithstanding the Rodman defendants' claim to the contrary. Thus, we have jurisdiction. 28 U.S.C. § 1291.

On appeal plaintiffs raise five issues: three under section 12(2) of the 1933 Act, one under section 10(b) of the 1934 Act, and one under the registration provisions of the Illinois Securities Law of 1953.

▮ Our review of questions of law, whether federal or state, is *de novo. Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Conversely, Fed.R.Civ.P. 52(a) directs that a district court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Thus, where "the district court's account of the evidence is plausible in light of the record viewed in its entirety," the reviewing court may not reverse merely because it would have "weighed the evidence differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Likewise, "[w]here there are two permissible views of the evidence, the factfinder's choice cannot be clearly erroneous." *Id.* (citations omitted). In the present case much depended on the testimony of the witnesses. Therefore, we must be ever mindful that "when a trial judge's finding is based on his decision to credit the testimony of one or two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575, 105 S.Ct. at 1512. Lastly, review of mixed questions of law and fact is deferential "when it appears that the district court is better positioned than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina College,* — U.S. at —, 111 S.Ct. at 1222 (quotation marks and citation omitted). That is the situation here: the applicable securities laws are clear and uncontroverted, and Judge Zagel had adequate opportunity to scrutinize the forty witnesses and numerous exhibits during the twenty-plus days of trial.

## SECTION 12(2) ISSUES

Section 12(2) of the 1933 Act imposes civil liability on any person who

offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading....

15 U.S.C. § 77*l* (2). Section 12(2) also provides the affirmative defense of due diligence by limiting liability to one "who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission...." *Id.* *See, for example, Sanders v. John Nuveen & Co.,* 524 F.2d 1064 (7th Cir.1975), *vacated,* 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976) [16] (*"Sanders I"*), and *Sanders v. John Nuveen & Co.,* 619 F.2d 1222 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981) (*"Sanders III"*). Section 13 of the 1933 Act specifies that the action must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence ... [but i]n no event ... more than three years after the sale." 15 U.S.C. § 77m. The parties do not dispute that the limited partnerships sold are securities or that the Rodman defendants are sellers, although the latter was an issue at trial. They do dispute the district court's findings of materiality, due diligence, and time limitation on the action.

First, the plaintiffs argue the district court erred in finding the following "facts" were not material, whether omitted or stated but untrue: [17] (1) With regard to all three programs, the plaintiffs were told (a) the programs were conservative and low risk, (b) the letters of credit would likely not be called, and (c) previous PEXCO programs had been economically successful. (2) With regard to the 81–1 program, the plaintiffs were told (a) the drilling would be developmental, on choice acreage, in areas of proven reserves, (b) the rate of return could be 3 to 1, and (c) at worst the project would break even. (3) With regard to the 81–Year End program, the plaintiffs were told (a) drilling would be on good acreage, (b) there would be a substantial return on their investments, from 2 to 1 up to 8 to 1, and (c) Rodman & Renshaw were in the process of securing a production loan, thus, the 81–1 purchasers need not be concerned their letters of credit might be called. (4) With regard to the 82–2 program, the plaintiffs were told (a) a new type of geo-technical (We think the plaintiffs mean, "geo-chemical.") technique used would virtually eliminate the possibility of not hitting oil and (b) they would make money on the program.

■ "Materiality," the Supreme Court has stated, "may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Consequently, review is deferential. *See, Salve Regina College,* — U.S. at ——, 111 S.Ct. at 1222. Both parties cite *Rowe v. Maremont Corp.,* 850 F.2d 1226 (7th Cir.1988), for the proposition that a court of review "will normally reverse a district court's findings of materiality and relevance only if those findings are clearly erroneous." *Id.* at 1234 (citation omitted; standard applied to a finding under Rule 10b–5). We proceed accordingly.

Our review of the evidence finds ample support for the district court's finding. The offering memoranda themselves leave no doubt. For example:

> *THE PURCHASE OF THE UNITS OFFERED HEREBY IS SUBJECT TO A HIGH DEGREE OF RISK....*
>
> *In General.* Oil and gas exploration and development is a high-risk activity whose results cannot be accurately forecast. No assurance can be given that amounts subscribed to the Partnership will be recovered or that any profit will be realized; nor is there any assurance production will be obtained or, even if obtained, that it can be obtained in profitable quantities, or in quantities sufficient to retire a Partner's share of the Letter of Credit Loan. In such event, a Partner

---

**16.** Remanded for reconsideration in light of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *See, on remand, Sanders v. John Nuveen & Co.,* 554 F.2d 790 (7th Cir.1977) (*"Sanders II"*).

**17.** This list contains only those "facts" raised by the plaintiffs-appellants in the argument portion of their brief.

would suffer the loss of all of his Partnership Subscription, and the Partner would be required to pay, in cash, the balance of his Partnership Subscription, plus interest on the Letter of Credit Loan. *SUBSCRIPTION TO UNITS SHOULD ONLY BE MADE BY THOSE PARTNERS WHO CAN AFFORD THE LOSS OF THEIR ENTIRE PARTNERSHIP SUBSCRIPTION.* . . . [81–1 mem. at 8; 81–Year End mem. at 10; 82–2 mem. at 11.]

. . . .

*High Degree of Business Risk.* Exploration for and development of oil and gas is extremely hazardous by its nature and involves a degree of risk of[18] loss. The ratio of productive oil and gas wells has been low when compared to the total number of wells drilled. In addition, completion of a producing well does not necessarily assure the recovery of costs expended thereon. [81–1 mem. at 10–11; 81–Year End mem. at 12; 82–2 mem. at 13.]

. . . .

*THIS* [ LETTER OF CREDIT] *LOAN REPAYMENT REQUIREMENT MAY CREATE A POSSIBLE NEGATIVE CASH FLOW FOR A PARTNER IN THE SECOND AND SUBSEQUENT YEARS OF THE PARTNERSHIP'S OPERATIONS.* [81–1 mem. at 13; 81–Year End mem. at 14; 82–2 mem. at 15.]

*General Risks of Oil and Gas Exploration and Development.* . . .

Original estimates concerning the success of initial drilling results may prove highly misleading. . . . Reliable estimates can only be developed after the well has been producing for a substantial period of time, frequently for several years.[19 81–1 mem. at 16–17; 81–Year End mem. at 17; 82–2 mem. at 18.]

*Letter of Credit Option.* . . . Persons subscribing under the Letter of Credit option shall pay their subscription in the following manner: $1,000 per Unit shall be paid in cash upon subscription and the remaining $9,000 per Unit shall be payable on a deferred basis (but in no event later than 24 months from Activation of the Partnership). . . . [81–1 mem. at 42; 81–Year End mem. at 20; 82–2 mem. at 22.20]

. . . .

*THE GENERAL PARTNER OFFERS NO ASSURANCES THAT SUFFICIENT RESERVES WILL BE DISCOVERED TO CONVERT THE LETTER OF CREDIT LOAN TO A PRODUCTION LOAN AND THEREBY RELEASE THE LETTERS OF CREDIT.* . . . [81–1 mem. at 44; 81–Year End mem. at 22; 82–2 mem. at 24.]

■ At oral argument the plaintiffs asserted the district court erred by placing too much reliance on the private offering memoranda and not enough on oral representations. Similarly, they urged us to look to what they were told, or not told, and to not rely on the printed offering, but that is not the law. In *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985), we stated, "The principle that the written statement controls the oral one is a staple of contract law, and we agree . . . that it should be used in securities law as well." Consequently, "[w]hen the issuer discloses the truth, an oral variance is not a legal cause for injury." *Id.* As far as what the plaintiffs claim they were told about the risks of the investment, its profitability, and calling the letters of credit, and to the extent those oral representations differ from the corresponding memorandum, the plaintiffs have not established a legal cause of injury.

■ Plaintiffs also find three other facts material. First, the definition of "developmental acreage" given in the 81–1 memorandum differed from the definition published by the AAPG. The memorandum

---

18. The 81–Year End and 82–2 memoranda state "or," not "of."

19. The last four words of this sentence are omitted in the 82–2 memorandum.

20. Units of the 82–2 program were offered in $5,000 increments; thus, letter of credit subscribers paid $500 cash and $4,500 via the letter of credit. Otherwise, the quoted portions of the three memoranda are identical.

did use the term, "developmental acreage," and did contain a definition of "developmental acreage," but it also stated the definition given differed from the AAPG's. There was no material misstatement here. Second, Berry had a leasehold interest in the Pritchard Field. Plaintiffs, however, ignore the fact that it was and still is common practice for a promoter or other interested party to own a piece of the action in oil prospects, generally in the form of a leasehold, working, or overriding royalty interest; some may even hold mineral rights themselves. If there is no production there is no royalty, although there may be a salary for work performed and valuable information may well be gleaned at another person's expense. The court did not abuse its discretion in this matter either. Third, at oral argument plaintiffs made much of their view that the wells, or at least some wells, were wildcats, not developmental or exploratory. They cite no evidence in the record to that effect nor an AAPG definition of wildcat and facts in conformity therewith; and in claiming that wells are wildcats and not exploratory, they transpose the set with the subset. Moreover, we would be hardput to view them as wildcats rather than, at most, as exploratory step-outs, and many appear to be developmental wells used concomitantly to explore for new oil or gas.

We, therefore, find the court was not clearly erroneous and did not abuse its discretion in finding the facts allegedly omitted or misstated were not material.

■ Second, the plaintiffs argue the district court erred in finding the Rodman defendants had conducted a reasonable investigation of the 81–Year End program and, thus, had proven the defense of due diligence, although they failed to discover the previous waterflood operation in the Pritchard Field.

Clearly, as the trial court must have found, previous waterflooding of the Ranger Sand in the Pritchard Field was a material fact; Berry's failure to discover or disclose that fact resulted in an award of damages against him. A previous water-flood or even an attempted one is material for at least two reasons.[21] First, if successful, a waterflood will remove oil from the reservoir and correspondingly reduce the amount that could be recovered by a later one. Second, if the previous attempt failed, the prognosis ranges from good to grave. If the water was injected into the wrong horizon, the reservoir might not have been affected. Similarly, if the attempt was simply ineptly or incompletely done, the reservoir might not have been affected too adversely and the hydrocarbons might still be largely recoverable. On the other hand, if the attempt severely damaged the reservoir, as occurs, for example, when the injected water reacts with the reservoir rock to plug porosity or when it bypasses and, thus, traps the oil in place, future·production would be severely diminished if not reduced entirely to nil.

■ Whether a defendant who failed to reveal a material fact exercised due diligence—that is, exercised reasonable care—depends·on the circumstances of the case. *Sanders III,* 619 F.2d at 1228. One important circumstance is the nature of the securities at risk. For example, the court in *Sanders I,* 524 F.2d at 1071, took "into consideration the fact that the security was short term commercial paper rather than stock or long·term indebtedness." Here, we take into consideration the fact that the 81–Year End memorandum did not expressly offer investors a waterflood program— in fact the plaintiffs complain because the offering memorandum did not state a waterflood was contemplated. It would be one thing if the plaintiffs had been sold a waterflood program or even a program expressly incorporating a waterflood project. *See, for example, Varn v. Maloney,* 516 P.2d 1328 (Okl.1973) (common-law fraud found based on materially false representations, both misstatements and omissions). But they were sold a very general, oil and gas program:

The General Partner presently estimates that not less than eighty percent (80%) of the Partnership subscriptions, less the

**21.** *See* the discussion in Dickey at 423–64.

Management Fee paid to the General Partner [22], will be expended on developmental wells. Operations may be conducted in any state if prospects considered attractive by the General Partner are presented to it.

81–Year End mem. at 25.

■ While it is a close call because of the extremely deleterious consequences a previous waterflood operation can cause, our review of the whole record indicates the district court did not abuse its discretion or clearly err in finding the Rodman defendants met their burden of proving due diligence. There was testimony by the Rodman defendant's expert witness, Louis G. Mosburg, Jr., an attorney with 30 years' experience in oil and gas law—both in investments and real estate—that Rodman & Renshaw's exercise of due diligence had been higher than the custom and practice of the industry at that time.[23] Defendant Rice, a CPA and registered representative of Rodman & Renshaw, testified that, upon learning in late 1983 that the Pritchard Field might have been previously waterflooded,[24] he contacted an organization in Austin, Texas, identified elsewhere as Records Research, Inc. The record of the prior waterflood was then discovered after a second, much more exhaustive search than Records Research had conducted earlier in 1983 for the general partner. The second search was also costlier, $200 versus $10. Thus, the trial court had testimony that a search had twice been undertaken to determine if a waterflood had been attempted in the field: once by the general partner before the operation got under way, and once by Rice of Rodman & Renshaw when a suspicion arose.

The plaintiffs also argue the trial court erred in finding the defendants adequately investigated the economic standing of prior PEXCO offerings and the Barringer process discussed in the 82–2 program.

The record more than supports the court's finding on the former issue. For example, the Rodman defendants sought information about the general partner, the drilling contractor, and various prospects from the Texas Railroad Commission, Lewis Engineering, subsequently, McCord–Lewis Energy Services, and an engineer named Crutchfield, among other sources. On the latter issue, the court stated, "As to the Barringer Process used in 82–2, the defendants made no misrepresentations." *Ambrosino*, mem. op. at 20, 1990 WL 129564. Consequently, due diligence is not an issue.

Third, the plaintiffs argue the district court erred in finding the 81–1 investors' claim that the Rodman defendants "knowingly failed to disclose that the earlier programs would not be economically successful ... is time-barred." The court went on to find that none of the alleged misstatements and omissions were material, except, as implied by the court's due-diligence holding, the prior waterflood. Having affirmed the trial court's holdings on materiality and due diligence, we need not address the time limitation issue.

## SECTION 10(b) AND RULE 10b–5 ISSUE

■ Section 10(b) of the 1934 Act, along with Rule 10b–5, promulgated by the Securities and Exchange Commission ("SEC") to flesh out that section, provides "a cause of action for any plaintiff who suffers an injury as a result of manipulative or deceptive practices made in connection with his or her sale or purchase of securities." *Norris v. Wirtz*, 719 F.2d 256, 258 (7th Cir.1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984) (citation omitted). To prove a Rule 10b–5 violation, a plaintiff must prove the defendant engaged in manipulation or deception in selling or purchasing a security. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). There must be a showing, inter

---

**22.** Fifteen percent of the subscription.

**23.** But even conforming to industry standard may not shield one from liability. *See The T.J. Hooper*, 60 F.2d 737 (2nd Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

**24.** John J. Harte, a coprincipal of the general partner, testified that an employee of Stevens Engineering, a company hired to investigate the waterflood project, learned of the prior waterflood from an "old timer" he bumped into at the oilfield.

alia, that the defendant acted with the "intent to deceive, manipulate or defraud" and was not merely negligent (*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 214, 96 S.Ct. 1375, 1380, 1391, 47 L.Ed.2d 668 (1976)) or that the defendant acted with "reckless disregard for the truth of the material asserted," whether by commission or omission. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). Moreover, the plaintiff must show "there is a 'substantial likelihood' that the misrepresentation 'substantially altered the "total mix" of information' that the investor possesse[d]." *Teamsters Local 282*, 762 F.2d at 530 (citing *TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132).

 The plaintiffs argue the district court erred in finding "that none of the omissions and misrepresentations which were made by [the Rodman] defendants were made with an intent to defraud or reckless disregard for the truth of the representations." We review findings of intent and reckless conduct under Rule 10b–5 for clear error. *Zurad v. Lehman Brothers Kuhn Loeb Inc.*, 757 F.2d 129, 133 (7th Cir.1985).

 In finding for the defendants, the court stated:

Most importantly, none of the omissions and misrepresentations were made with the requisite mental state—at the very least recklessness. The defendants exceeded the required standard for due diligence in seeking to uncover the possibility of fraud. They disclosed all material facts. As we noted previously, if the fraud is that the defendants knew earlier partnerships could not be successful at the time the defendants sold subsequent partnership interests, the defendants never believed the earlier programs would not be successful. We find this to

be true. We find Harte's[25] testimony credible that had oil prices not fallen, 81–1 could have paid off the letters of credit and returned the investors a profit over the cash they invested.

*Ambrosino*, mem. op. at 24, 1990 WL 129564.

The plaintiffs have not shown that Harte's testimony was either internally inconsistent or contradicted by extrinsic evidence. Thus, the court's determination to credit his testimony is not clearly erroneous; neither is its corresponding holding. *See Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512. Additionally, we have already affirmed the court's holdings that the Rodman defendants exercised due diligence with regard to both the waterflood and the economic standing of prior PEXCO programs and that they neither omitted nor misrepresented any other material fact. *See Rowe*, 850 F.2d at 1232–33 ("A court may predicate Rule 10b–5 liability only on material omissions or misstatements.").

Plaintiffs press the point, however, that the "defendants knew that the well's production was declining ... that the wells being drilled would have their highest level of production in the early drilling months and then those levels of production would drop." The point, while most likely true, has no relationship whatsoever to a violation of Rule 10b–5. The productivity of all oil wells naturally declines with continued production. *See, for example*, DICKEY at 417–18 and HOBSON and TIRATSOO at 312 Fig. 86.[26] Highest productivity, absent some sort of subsequent stimulation or enhancement, occurs very early in a well's production history, generally in the first few weeks or months of its being on-line. This is common knowledge throughout the industry. Moreover, the 81–1 memorandum described typical Austin Chalk and Buda Limestone wells in Caldwell County, Texas,[27] as follows:

---

**25.** Recall, Harte is a coprincipal of the general partner.

**26.** We note, too, the plaintiffs introduced into evidence a number of, what are appropriately and accurately denominated, decline curves. Plaintiff's Exhibit Nos. 10–14.

**27.** Recall, the 81–1 program had drilled eight producing but ultimately non-economic wells into the Austin Chalk Formation in Caldwell County.

Following drilling, the formation at the bottom of the well is "fractured" in order to stimulate the flow of oil and gas. Following such fracture, an initial flow of oil will be obtained in the rate of 10 to 50 barrels of oil per day is possible [*sic*]. This flow rate will decline steadily during an initial period of approximately six months, after which the flow will remain at a relatively flat rate of production of usually less than 10 barrels per day.

81–1 mem. at 53–54. The 81–1 investors, at least, had been informed, and all investors had access to the information either in the common pool of knowledge or the 81–1 memorandum.

Therefore, we hold the district court did not abuse its discretion and was not clearly erroneous.

## STATE REGISTRATION ISSUE

The Illinois Securities Law of 1953 requires registration of all securities sold in Illinois unless exempted by statute. ILL. REV.STAT. ch. 121½, ¶ 137.5. Exemptions in effect at the time of the challenged sale included (1) sales to securities dealers and "to any partnership or association engaged as a substantial part of its business or operation in purchasing or holding securities" and (2) sales, not otherwise exempt, to not more than thirty-five persons in the State provided, inter alia, not more than seventy[28] offers were similarly made and the required report was appropriately and timely filed. ILL.REV.STAT. ch. 121½, ¶¶ 137.4C, 137.4G. *See Benjamin v. Cablevision Programming Investments*, 114 Ill.2d 150, 102 Ill.Dec. 296, 499 N.E.2d 1309 (1986). A sale of securities in violation of paragraph 137.5 may be voided by the purchaser within six months of discovering that the sale is voidable. ILL.REV.STAT. ch. 121½, ¶ 137.13.

None of the three PEXCO limited partnerships were registered in Illinois, but the court found all three were exempt under one or more provisions of paragraph 137.4.

On appeal the plaintiffs argue the court erred with respect to the 81–Year End program. They do not challenge the court's statement of Illinois law, which we would review *de novo*. *See Salve Regina College,* —— U.S. ——, 111 S.Ct. 1217. Instead, they challenge the court's findings that certain persons, partnerships, and associations were exempt from registration in Illinois and that certain associations and partnerships were single investors. In so doing, the plaintiffs argue the evidence favored their position. Thus, our review is deferential and the court's weighing of the evidence will not be reversed absent clear error. *Id.; Anderson,* 470 U.S. at 564, 105 S.Ct. at 1504.

Plaintiffs argue the court erred in finding six investors were exempt as securities dealers: Daniel N. Ambrosino, Daniel Flesch, Roger A. Householder, Christie C. and Richard A. Reed, who purchased together as one investor, Paul E. Sussman, and, as identified in the Rodman defendants' brief, Robert B. Smidt,[29] a non-plaintiff. Plaintiffs assert that four of these six investors were salespersons and, thus, are not exempt as dealers under paragraph 137.4C. They also assert three were registered representatives of Rodman & Renshaw, that this is equivalent to being a salesperson, and, thus, the three are not exempt under paragraph 137.4C. Plaintiffs, however, have not given us the names of the four alleged salespersons or the three alleged registered representatives. Lastly, they assert that none of the six were dealers, but, rather, it was the corporations for which they worked that were the dealers.

Paragraph 137.4C exempts sales to dealers from the registration requirements of paragraph 137.5. ILL.REV.STAT. ch. 121½, ¶¶ 137.4C, 137.5. Paragraph 137.2–7 defines "dealer" as

---

**28.** Paragraph 137.4G now limits distribution of a prospectus or preliminary prospectus to not "more than 150 residents of the State" and has undergone other changes not relevant here.

**29.** Because Christie C. and Richard A. Reed count as one investor and the plaintiffs did not name the sixth investor, we must rely on the Rodman defendants' uncontroverted statement at page 44 in their brief to identify the sixth investor cum dealer.

any person, other than a salesperson, ... who engages in this State, either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, selling, buying and selling, or otherwise dealing or trading in securities issued by another person, any government or political subdivision or instrumentality thereof.

ILL.REV.STAT. ch. 121½, ¶ 137.2–7. "Salesperson" is defined in section 137.2–9 as "an individual, other than an issuer or a dealer, employed or appointed or authorized by a dealer, issuer or controlling person to offer, purchase or sell securities in this State." ILL.REV.STAT. ch. 121½, ¶ 137.2–9. Because dealers are exempt under paragraph 137.4C, they are not counted as purchasers for purposes of the paragraph 137.4G exemption. ILL.REV.STAT. ch. 121½, ¶ 137.4G(2).

■ The testimony of six broker-dealers, comprising but five investors that plaintiffs claim are not entitled to the securities-dealer exemption, supports the court's finding that they are exempt dealers. Ambrosino testified he was the sole shareholder, employee and nominee of DNA Limited, Inc., a corporation, bearing his initials, that was registered with the SEC and owned a seat on the Chicago Board of Options Exchange ("CBOE"); he also testified he was a floor broker. Flesch testified he was the sole shareholder, employee and nominee of Cardan, Inc., and that he was a registered broker-dealer with the SEC. Householder testified he was the sole shareholder, employee and nominee of Householder Enterprises, a corporation registered with the SEC that owned a seat on the CBOE. Christie Reed testified that she and her husband, Richard, each had owned a seat on the CBOE before they married and that each became a shareholder, employee and nominee of Reed & Partners, a corporation that owned their two seats on the CBOE; she also testified that she and Richard might have been registered with the SEC and Illinois as broker-dealers but was unsure on this point. Richard Reed testified to being a nominee and market maker for Reed & Partners. Sussman testified he was the sole share-

holder, employee and nominee of Hancock Securities Corp. and that he, not the corporation, owned a seat on the CBOE; he also testified he was unsure whether he was registered as a broker-dealer with the SEC and the State of Illinois. Robert B. Smidt did not testify.

Given these plaintiffs' own testimony, it is both reasonable and plausible for the court to have found they were exempt securities-dealers and not salespersons. Moreover, the plaintiffs cite no evidence in the record that controverts or is inconsistent with the court's finding the non-plaintiff investor was also a dealer. Accordingly, we find no reversible error in the court's determination that six of the 81–Year End investors were dealers and, thus, exempt from being counted as purchasers for registration purposes.

■ Next, the plaintiffs argue the court erred in finding that two associations—H & R Investments and the Chura group, comprising four and three individuals, respectively—were single investors. The court found that H & R Investments existed prior to investing in the 81–1 program, which predated the 81–Year End program. Plaintiffs do not contest that finding; instead, they argue that, because its membership changed before H & R invested in the 81–Year End program, H & R was no longer a preexisting partnership. The only change was the departure of one member, Bruce Taylor, from H & R, which the court found did not materially change the partnership. The plaintiffs cite no authority for the proposition that simply the departure of one member from a partnership makes that partnership ineligible for a paragraph 137.4C exemption. Among the Chura group of investors—Steve R. Chura, Robert E. Malone, and James Hoffman—the court found that only Chura counted as an investor. This finding was based on facts determined by the court: "The subscription documents state[d] Chura invested for his own account.... [T]he Chura investors did not have the indicia of a partnership at the time of the investment in 81–YE. Malone and Hoffman did not sign a letter of credit until one year later." *Ambrosino,*

mem. op. at 29, 1990 WL 129564. Plaintiffs argue that "uncontroverted evidence established that the investors in the Chura group entered into a partnership agreement for the sole purpose of purchasing these limited partnership agreements." This view of the evidence differs from the trial court's, which itself is plausible. Therefore, the court's "choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511. We will not disturb the court's holdings with respect to either H & R Investments or the Chura group.

Lastly, plaintiffs argue the court erred by omission in not determining whether Morton Siegel, a non-plaintiff investor in the 81–Year End partnership, was exempt. It matters not. The court concluded that the number of non-exempt purchasers was not sufficient to require registration in Illinois, and we have affirmed all of the court's findings of exemption and determinations of status as a single investor that the plaintiffs challenged on appeal. Although the court did not state how many of the investors in the 81–Year End partnership counted toward requiring registration, the plaintiffs have not argued that Siegel would be the thirty-sixth, nor have they identified who the other thirty-five are. Accordingly, we cannot find that the court abused its discretion or was clearly erroneous.

## CONCLUSION

The judgment and order of the district court is

AFFIRMED.