Annette SEXSON, Wayne Watson, and Common Cause Incorporated, Plaintiffs–Appellees,

v.

Beurt R. SERVAAS, in his official capacity as the President of the Marion County City–County Council, William H. Hudnut, in his official capacity as Mayor of the City of Indianapolis, Marion County City–County Council, et al., Defendants–Appellants.

No. 94–1378.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1994.

Decided Aug. 25, 1994.

Kevin McShane, McShane & Gordon (argued) Stephen Laudig, Laudig & George, Indianapolis, IN, for plaintiffs-appellees.

Wayne C. Ponader (argued), Jeffrey S. Koehlinger, Bose, McKinney & Evans, Indianapolis, IN, Marilyn A. Moores, Cohen & Malad, Indianapolis, IN, for defendants-appellants.

Before CUMMINGS, MANION, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

The Indianapolis City Council proposed and passed a redistricting plan based on data from the 1990 census, in time for the May 1991 primary elections. A group of concerned citizens filed a lawsuit in state court, challenging the redistricting plan under state law. The defendants removed the case to federal court under 28 U.S.C. § 1443(2), claiming that compliance with state law would violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. The parties waived trial and submitted the case to the district judge on the record. The district judge determined that the defendants failed to support their claim that the state court proceedings would somehow transgress the Voting Rights Act. The court concluded that this was essentially a state law matter, where no federal laws were implicated, and remanded to state court, 844 F.Supp. 471. We affirm.

## I. Background

In 1969 the Indiana legislature enacted a law known as Unigov which unified the local governments of Marion County and the City of Indianapolis. Ind.Code §§ 36–3–1–1 to 36–3–4–24; see also *Cantwell v. Hudnut*, 566 F.2d 30 (7th Cir.1977). This case concerns the redistricting of the consolidated city-county. Indiana law specifies several basic requirements concerning city-county redistricting:

> The city-county legislative body shall, by ordinance, divide the whole county into twenty-five (25) districts that:
>
> (1) are compact, subject only to natural boundary lines (such as railroads, major highways, rivers, creeks, parks, and major industrial complexes);
>
> (2) contain, as nearly as possible, equal population; and
>
> (3) do not cross precinct boundary lines.

Ind.Code § 36–3–4–3(a). The law also allows any "taxpayer or registered voter" to challenge the redistricting plan, and provides a special legal procedure and expedited appeal to the Indiana Supreme Court, to consider the citizen's challenge. Ind.Code § 36–3–4–3(d).

In January 1991, the Indianapolis City Council, which was charged under law with the task of redistricting, set out to reformulate Marion County's twenty-five districts. By all accounts this was early for such an undertaking; the 1990 census figures would not be available until late February 1991, and the law did not require redistricting until 1992. See Ind.Code § 36–3–4–3(a). But the Council wanted to finish redistricting before the May 1991 primary elections, to assure representation which more accurately reflected the recent population data.

First, the Council drew seven districts where black citizens comprised at least a 60% majority. This was done so that the black citizens in those districts could select a "candidate of choice." Affidavit of Councilor Stephen R. West, p. 5. Because the districts did not fall along any symmetrical geographic lines, the Council had to strangely configure the seven minority districts to reach the 60% goal. This had somewhat of a domino effect: geometric principles dictated that the districts adjoining the strangely configured districts also ended up with oddly-shaped boundaries. The Council proceeded to draw the remaining eighteen districts around the minority districts, taking into account other political considerations, such as the incumbent council members' wishes about the com-

position of their districts. *Id.* The net effect of all this was a redistricting map which resembled more a jigsaw puzzle than a symmetrical grid. Mayor William Hudnut signed the Council's redistricting plan into law on March 26, 1991.

A group of concerned citizens filed suit in state court challenging the redistricting plan. Basically, they alleged that the designated districts were not compact and did not contain, as nearly as possible, equal populations as required under Indiana Code § 36–3–4–3(a). They wanted the state court to declare the ordinance invalid and to enjoin the May primary elections.

The defendants responded by removing the case to federal district court under 28 U.S.C. § 1443(2), which is commonly known as the "refusal clause." *See Greenberg v. Veteran,* 889 F.2d 418, 421 (2d Cir.1989). That provision allows removal of a case concerning "any act under color of authority derived from any law providing for equal rights, *or for refusing to do any act on the ground that it would be inconsistent with such law.*" Section 1443(2) (emphasis added). The defendants alleged in their notice of removal that the plaintiffs were seeking a redistricting formulation "which would be inconsistent with Section 2 of the Voting Rights Act." [1] They implied, essentially, that if the plaintiffs succeeded in their state court action, the Council would be forced to adopt a redistricting plan which violated federal law. They gave detail to this allegation when they answered the complaint in district court; they inserted the following affirmative defense:

> The defendants allege and state that the redistricting obligations imposed by I.C.

36–3–4–3(a) directly conflict with defendants' obligations under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and that Plaintiffs' claims under I.C. 36–3–4–3(a) are therefore specifically preempted by the requirements of federal law.

Answer at 5.

The plaintiffs moved for a remand, arguing that the federal court lacked the authority to decide the state law case. But the district court denied that motion. The court reasoned that the defendants had made a "colorable claim" that any redistricting plan which complied with Indiana Code § 36–3–4–3–(a) would necessarily violate Section 2 of the Voting Rights Act. Therefore, according to the court, removal was proper under the refusal clause.

Discovery proceeded in the district court. The parties decided to present the case to the judge on a submitted record. *See May v. Evansville–Vanderburg School Corp.,* 787 F.2d 1105, 1115 (7th Cir.1986) (parties may agree to waive trial, and present the case to a district judge based on a submitted record). The judge requested trial briefs from both sides. The defendants devoted only a small portion of their brief to their affirmative defense concerning the Voting Rights Act. The judge found this unacceptable. The defendants had the burden to prove their affirmative defense—indeed, they were only in federal court because they had asserted it—and it was time to determine whether they had any more than just a "colorable claim." The judge described her concerns in part as follows:

> The significance of the Defendants' Section 2 defense is obvious because, if Section 2

---

1. Section 2 of the Voting Rights Act provides:

    (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(2) of this title, as provided in subsection (b) of this section.

    (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in

the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. §§ 1973(a) and (b).

requires the City–County Council to adopt the present configuration of districts, and no other configuration was possible in view of all the underlying facts and considerations, the Court may not need to reach the question whether that configuration violates Indiana law. *See* U.S. Const. Art. VI. The latter state law claims are before the Court pursuant to its supplemental jurisdiction. *See* 28 U.S.C. § 1367. Because they so thoroughly occupied the attention of the Defendants and their arguments and briefs in this case, the Court feels compelled to ask whether they have intentionally abandoned their third affirmative defense.

The judge ordered the defendants to submit evidence and argument showing that the Voting Rights Act required redistricting according to their formula, and prohibited redistricting along the vague outline provided in Indiana Code § 36–3–4–3(a). In response, the defendants made what we can only suppose was their best argument:

> While Section 2, standing alone, may not expressly require the exact configuration of the boundaries of the twenty-five-member districts as they are presently embodied in the Council Plan, the council's judgment, contained in the Council Plan, as to what Section 2 required of it in creating African–American, majority-single-member districts, when coupled with the fundamental presumption of the deference that attaches to the council's reapportionment effort, controls this Court's resolution of, and in essence "preempts," Plaintiffs' state law compactness and equal population challenges to the Council Plan on the facts of this case.

Significantly, this response conceded that the Voting Rights Act does not necessarily prohibit redistricting in accordance with Indiana Code § 36–3–4–3(a). The defendants abandoned this argument in favor of another: that because the Council formulated the redistricting plan in accordance with the Voting Rights Act, any alternative plan would necessarily violate federal law. The court read this cryptically worded response as an abandonment of the affirmative defense.

With the affirmative defense successfully defeated (or more accurately, inadequately defended), there was no longer justification for removal. The case ceased to concern the Voting Rights Act, and now only concerned Indiana redistricting law. The defendants' new assertion—that it formulated the redistricting plan in reliance on the Voting Rights Act and any attack on that plan therefore violated federal law—was not enough to justify removal under the refusal clause. The defendants could not say that other redistricting plans, including any one that the plaintiffs favored, would necessarily violate the Voting Rights Act. Therefore, the idea that federal law was somehow threatened ceased to be an immediate concern. The district court remanded the case to Indiana state court so that the state could resolve its own redistricting dispute.

The defendants have appealed the remand order under 28 U.S.C. § 1447(d). That statute provides that although remand orders generally are not appealable, there is an exception to this rule for cases—like this one—removed under 28 U.S.C. § 1443. Therefore, we have jurisdiction to hear this appeal. We must determine whether the district court erred in remanding this case after determining that the only possible civil rights question—an impending violation of the Voting Rights Act—was not viable.

## II. Analysis

■ From the time of its removal to federal court, two important interests have competed in this case: the state's interest in apportionment, and the federal government's interest in enforcing its voting rights laws. Usually, the state's interest in apportionment is immune from federal intrusion. *See Growe v. Emison,* —— U.S. ——, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993) (" 'reapportionment is primarily the duty and responsibility of the State to its legislature or other body, rather than of a federal court.' ") (quoting *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975)). There is a narrow exception to this general rule, however, when a state apportionment decision contravenes federal law. *See Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct.

1149, 1157, 122 L.Ed.2d 500 (1993) ("federal courts are bound to respect the State's apportionment choices unless those choices contravene federal requirements."). If state apportionment violates federal law, the federal interest trumps the state interest, at least until the federal question is resolved.

In 1991, the Indianapolis City Council formulated an apportionment plan in response to the just completed census. A group of citizens filed suit in an Indiana court contesting the redistricting plan; Indiana law expressly allowed such a challenge and set forth a special procedural sequence for judicial review. Ind.Code § 36–3–4–3(d). But the defendants in the suit avoided immediate review in an Indiana court. They found solace in federal court, under the narrow exception which allowed a federal court to intercede into a state apportionment dispute if federal law is threatened. They invoked the refusal clause, 28 U.S.C. § 1443(2), as the procedural means to gain access to the federal forum.

■ When the district court was asked to review the providence of removal, it determined that the defendants had made a colorable claim under the refusal clause. "[T]he refusal clause may be invoked when the removing defendants make a colorable claim that they are being sued for not acting pursuant to a state law, which, though facially neutral, would produce or perpetuate a racially discriminatory practice as applied." *Greenberg*, 889 F.2d at 421 (internal quotations omitted). The defendants claimed that if they were forced to comply with the letter of Indiana law, as the plaintiffs wished, the federal Voting Rights Act would be violated. To the district court, this allegation was enough to justify involvement in this case.[2]

When the case proceeded to trial on a submitted record, the defendants' "colorable claim" under the refusal clause lost its hue. First, in their trial brief the defendants hardly addressed their affirmative defense concerning the Voting Rights Act, which was the ostensible basis for removal under the refus-

al clause. This was potentially fatal to their case since they had the burden to prove their affirmative defenses during trial, *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1068 (7th Cir.1992), and the trial on a submitted record was, essentially, a trial. *See May*, 787 F.2d at 1115. It was time for the defendants to show their cards; the district court ordered them to provide support for their affirmative defense.

■ As it turned out, the affirmative defense was not supportable. The defendants could not defend their contention that strict enforcement of Indiana law—or even close compliance with the plaintiffs' wishes—would violate the Voting Rights Act. Instead the defendants argued to the district court that their apportionment plan was in accordance with the Voting Rights Act, and suggested that any attack of the plan, therefore, violated the Voting Rights Act. The district court rejected this argument. Essentially, the district court concluded—after a trial on the record—that the defendants' affirmative defense failed.

[The Defendants' affirmative] defense is "that the districting obligations imposed by I.C. 36–3–4–3(a) directly conflict with Defendants' obligations under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and that Plaintiffs' claims under I.C. 36–3–4–3(a) are therefore specifically preempted by the requirements of federal law." Answer at 5. The Defendants now advise the Court that in fact Section 2 *does not require* the district boundaries to be drawn as they are presently configured, thereby undermining their contention that the Plaintiffs' claims are preempted by "the requirements of federal law". *Id.*

The district court went on to conclude that the defendants had essentially abandoned their affirmative defense. Because the district court did not purport to base this decision on a factual finding, we must conclude that this was a legal determination: the court concluded that under any version of facts presented in the trial, the affirmative defense

---

2. We have not been asked to review the district court's decision to allow removal in the first place. Therefore, we make no statement whether the affirmative defense presented a sufficient

"colorable claim" to warrant removal, and do not comment on the court's subsequent exercise of jurisdiction. We have been asked only to review the propriety of the remand.

failed as a matter of law. We have been asked to review that decision. "Our review of questions of law, whether federal or state, is *de novo*." *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 784 (7th Cir.1992).

■ We agree with the district court that, in the final analysis, the defendants' affirmative defense that gave them a toehold in federal court turned out to be meritless. When the defendants first asserted the affirmative defense, they gave the impression that they sought sanctuary in federal court out of fear that the state court might force them—against their will—to violate the Voting Rights Act. The district court accepted this version of events, but demanded proof during trial. The defendants had no proof; by their own admission they could not make the argument that state court proceedings threatened the Voting Rights Act because the state court proceedings had nothing to do with federal law. Having retreated from their original definitive assertion, they made another more tenuous one: they claimed federal law was implicated because their redistricting plan was in accordance with the Voting Rights Act.[3] From that assertion they made a logical leap, asking the court to accept the conclusion that any attack on their plan therefore violated the Voting Rights Act.

■ But it does not follow that just because an apportionment plan conforms with federal law, an attack on that plan necessarily seeks to transgress federal law. The Voting Rights Act established broad boundaries which no state apportionment law could contravene. Within those boundaries, in any given case, infinite variations of apportionment plans could be formulated, none of which would violate federal law. *See Voinovich*, —— U.S. at ——, 113 S.Ct. at 1156 (the Voting Rights Act "contains no *per se* prohibition against particular types of districts"). It simply does not follow, therefore, that because the defendants' apportionment plan complied with the Voting Rights Act, the plaintiffs' attack on that plan necessarily

threatened federal law. For all anybody knew, the plaintiffs could have been seeking an alternative apportionment plan which also fully complied with federal law but varied from the defendants' plan only in its interpretation of state law.

■ Once the affirmative defense fell out of the case, the federal question which was the basis for removal under the refusal clause disappeared. The district court was left, essentially, with a state law reapportionment question. The court considered the Supreme Court's edict in *Voinovich:* "Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place." —— U.S. at ——, 113 S.Ct. at 1156. The court also considered whether the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), allowed it to retain jurisdiction over the state issues. Ultimately, the court determined that it was bound by *Voinovich* to remand the remaining state law issues. We agree; the district court was compelled to remand the state law issues once the federal claim was eliminated. It would have been improvident for the district court to exercise jurisdiction over the state claims when it became clear that the Voting Rights Act was not implicated.

### III. Conclusion

For the foregoing reasons, we

AFFIRM.

---

**3.** We upheld the city-county redistricting plan at issue in *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357 (7th Cir.1992). That case has no bearing on the propriety of remand in this case, except that it possibly confirms the defendants' assertion that their redistricting plan complies with the Voting Rights Act.