**Thomas M. WAMSER, Plaintiff,**

v.

**J.E. LISS, INC. and Thomas Dougherty, Defendants.**

**No. 91–C–1171.**

United States District Court, E.D. Wisconsin.

Nov. 18, 1993.

John L. Kirtley, Godfrey & Kahn, S.C., Milwaukee, WI, for plaintiff.

Colleen A. Scherkenbach, Quarles & Brady, Milwaukee, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

Plaintiff, Thomas M. Wamser (Wamser), sues defendants J.E. Liss and Company, Inc. ("Liss"), a brokerage firm, and Thomas Dougherty ("Dougherty"), a broker for Liss, alleging oral misrepresentations and factual omissions in violation of 15 U.S.C. § 77*l*(2) (§ 12(2) of the Securities Act of 1933), Wis. Stat. § 551.41, and Wis.Stat. § 100.18.[1] Liss and Dougherty move for summary judgment asserting that Wamser fails, as a matter of law, to show either "loss causation" (that the alleged fraud caused his loss) or "justifiable reliance" (that he relied on the oral representations and omissions). Wamser counters that neither "loss causation" nor "justifiable reliance" are elements of a claim under § 12(2), nor are they elements of a claim under § 551.41, which parallels the federal statute. Wamser further asserts that justifiable reliance is not an element of the state common law claims, nor of Wis.Stat. § 100.-18.[2] The Court, however, finds that the issue is more accurately described as one of "materiality" and further finds, for the following reasons, that defendants' motion should be granted.

### FACTS

In March of 1990, Liss was the Wisconsin placement agent for a private offering of

---

**1.** Wamser also raises state common law fraud claims, including intentional misrepresentation, negligent misrepresentation and strict responsibility representation.

**2.** Wamser also filed a motion to compel two items from the defendants: (1) A name and date log recording the transfer of American Bionetics

Private Placement memoranda to potential investors, and (2) all records in Liss's possession regarding other investors in American Bionetics. Because Wamser's motion is untimely, and because the information sought does not bear upon the summary judgment motion, the motion is denied.

common stock and stock purchase warrants in a California company named American Bionetics, Inc. ("Bionetics"). (Defendants' Proposed Findings of Fact ("DFOF") at ¶ 6; Plaintiff's Response to Defendants' Statement of Facts ("Resp.") at ¶ 1.) Bionetics developed, manufactured, marketed and distributed (worldwide) clinical tests, reagents and instruments for research and clinical applications. (DFOF at ¶ 7; Resp. at ¶ 2.) Among the clinical tests that Bionetics developed and began marketing in 1990 was an automated system for processing Western blot AIDS and AIDS-related confirmatory tests. (Id.)

Dougherty contacted Wamser to see if he was interested in investing through Liss. (DFOF at ¶ 9; Resp. at ¶ 1.) Wamser previously had an account with Kidder Peabody and was referred to Dougherty by the broker for that account. (Id.) Wamser had previously been solicited for a different private placement investment and had rejected it. (DFOF at ¶ 10; Resp. at ¶ 4.) According to Dougherty, he provided Wamser with a confidential offering circular for American Bionetics before Wamser made the decision to invest. (Dougherty Dep. at 30.) Wamser, however, does not recall whether he saw the confidential offering circular before investing in Bionetics (Wamser Dep. at 39–40) and states he did not read the circular or any other written materials before investing. (Id. at 95–96.) Wamser did, however, type his own responses to and complete and sign a subscription agreement in which he, as the subscriber and signer, represented that: (1) He received and read the offering circular; (2) he got all additional information necessary to verify the accuracy of the information in the offering circular; and (3) he had not relied on any information other than that which was contained in the offering circular and provided by representatives of Bionetics in making his investment decision. (DFOF at ¶ 12; Resp. at ¶ 6.) Despite these written disclaimers, Wamser claims he relied only upon certain oral representations communicated by Dougherty when investing in Bionetics. (DFOF ¶ 13; Resp. at ¶ 7.) Wamser ultimately purchased 200,000 shares of Bionetics common stock and 80,000 warrants for $80,000. (Id.)

At the time of the investment, Wamser was president and chief executive officer of Beck Carton Corporation ("Beck"). (DFOF at ¶ 14; Resp. at ¶ 8.) Beck is a printer and manufacturer of paperboard packaging with sales of $12 million for the year ending 1992. (Id.) Beck is a closely held corporation in which Wamser, his wife, and two children are the only shareholders. (Id.) Wamser purchased Beck in 1982 for more than $1,000,-000. (Id.) Wamser is a trustee for Beck's pension and profit sharing plan and he has made all of the investment decisions on behalf of the corporation. (DFOF at ¶ 15; Resp. at ¶ 8.) Beck's portfolio of investments includes stocks, bonds and money market investments totalling several hundred thousand dollars. (Id.) Wamser also handles Beck's strategic planning. (Id.) Before purchasing Beck, Wamser started a steel fabricating firm called Vulcan Technologies ("Vulcan"). (DFOF at ¶ 16; Resp. at ¶ 8.) Wamser sold Vulcan in 1989. (Id.)

Wamser attended three years of college education in sales and marketing at Marquette University and started investing in the stock market in 1985. (Wamser Dep. at 15; DFOF at ¶ 18; Resp. at ¶ 8.) Between 1985 and 1989 he had investment accounts at Blunt, Ellis and Loewi, Shearson Lehman, Oppenheimer and Co., Robert W. Baird, and Kidder Peabody & Co., Inc. (DFOF at ¶ 18; Resp. at ¶ 8.) In a pretrial deposition, Wamser stated he previously rejected investments that he believed would have been too risky. (DFOF at ¶ 19; Resp. at ¶ 8.) In addition, he considered only savings accounts and money market funds as "no risk" investments. (Id.) Critical to the Court's decision, however, are the detailed and substantial warnings contained in the confidential offering circular provided to Wamser. Those warnings, detailed below, clearly state the risks of investing in Bionetics:

> Investment in the securities offered hereby is highly speculative and involves a high degree of risk. Prospective purchasers should carefully consider the information set forth under "risk factors" before purchasing these securities; see also "Investor Suitability Standards."

\* \* \* \* \* \*

Investment in the Units offered hereby involves a high degree of risk and is suitable only for persons having substantial financial resources who can afford to bear the economic risk of their investment for an indefinite period, including the risk of complete loss of such investment, have no need for liquidity in the investment and who understand the long term nature, tax consequences and risk factors associated with the investment.

\* \* \* \* \* \*

*RISK FACTORS* ... The securities offered hereby are highly speculative and involve a high degree of risk. Prospective purchasers, prior to making an investment decision, should carefully consider, among other factors referred to herein, the following risk factors:

1. *Cash Requirements.* The Company is currently experiencing a cash shortfall and is conserving its available cash pending receipt of the proceeds of this offering. Upon sale of the Units offered hereby, the net offering proceeds are forecasted to meet the Company's cash requirements for up to approximately nine months ... [t]his forecast, and the Company's ability to achieve positive cash flow within this period, will be dependent on significant sales increases and the Company's successful entry into the field of diagnostic products ... there is no assurance that the Company's diagnostic products will be successfully marketed ... [t]he Company currently has approximately $645,000 of accounts payable balances which are in excess of 60 days old ... [m]anagement earned compensation of more than $600,000 in fiscal year 1989, even though the Company continued to experience losses and cash flow problems ...

\* \* \* \* \* \*

2. *Operating Losses and Product Development.* The Company has operated at a loss in each of the years since its formation ...

\* \* \* \* \* \*

3. *Government Regulation....* While sale of the Company's Western blot testing products to research laboratories and facilities does not require U.S. Food and Drug Administration approval, bringing these products to the market as an AIDS diagnostic test qualifying certain blood donors would currently require FDA approval. Because of its limited resources and related factors, the Company has not yet begun this process, but instead will concentrate its present marketing efforts on the "For Research Only" segment of the market. The lack of FDA approval for the AIDS test kits could adversely affect acceptance of the Company's products in those markets the Company is able to serve....

\* \* \* \* \* \*

4. *Competition.* The Company faces substantial and potentially increased competition in the sale of its products. Many of the Company's present or potential competitors have significantly greater financial, technical, development and marketing resources. There can be no assurance that the Company will be able to compete successfully in the future.

\* \* \* \* \* \*

8. *Dependence on Key Personnel.* The business of the Company is highly dependent upon the services of Martin E. Marks, who serves as Chairman of its Board of Directors, President and Chief Executive Officer, as well as the other officers of the Company. The loss of any of their services could have a materially adverse effect on the Company....

\* \* \* \* \* \*

NO BROKER/DEALER, SALESMAN OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS OFFERING CIRCULAR OR PROVIDED, UPON REQUEST, BY THE COMPANY (see "ADDITIONAL INFORMATION") AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.

\* \* \* \* \* \*

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTA-

TIONS OR GIVE ANY INFORMATION WITH RESPECT TO THE COMPANY OR THE UNITS OFFERED HEREBY, EXCEPT THE INFORMATION CONTAINED HEREIN. PROSPECTIVE PURCHASERS SHOULD NOT RELY ON ANY INFORMATION NOT CONTAINED IN THIS CIRCULAR AND THE EXHIBITS HERETO.

(DFOF at ¶¶ 20–28; Resp. at ¶ 8; Defendants' Brief, Ex. A at 2, 4, 6, 15–17.) The offering circular further estimated that between $652,000 and $1,665,000 would be raised by the offering and that almost 60% of those proceeds would be used for reduction of company debts and accounts payable. (DFOF at ¶¶ 26–27; Resp. at 8; Ex. A. at 12–13, 29–30, 39–40, 48–50.) The circular also stated that Bionetics had lined up some major distribution contracts but was still negotiating a distribution agreement with its key U.S. distributor, Rupp and Bowman, and its Western blot product was "just now coming to market." (Id.)

Wamser claims that Dougherty made certain oral representations which later proved untrue and that Dougherty omitted certain information which, had he been told, would have caused him not to invest in Bionetics. The oral misrepresentations were all addressed in the circular and include the following: (1) That the private offering was a "no risk investment"; (2) that the offering was intended to raise approximately $2.5 million; (3) that Bionetics was a stable company with an opportunity to "take off" when its latest products—blood testing machines and kits for use in the diagnosis of AIDS and related viruses—reached the market; (4) that capital raised from the offering was earmarked for funding the distribution of Bionetics' latest products; (5) that Bionetics' latest products were so much faster, cheaper, and more accurate than anything else on the market they virtually had no competition; (6) that Bionetics was a party to several distribution contracts and stood ready to exploit the market for blood testing devices; (7) that no impediments existed for Bionetics' ability to mass market its blood testing equipment and kits;

and (8) that within a few months of the investment, Bionetics' stock price would rise to between $.75 and $.79 per share. (Plaintiff's Proposed Findings of Fact ("PFOF") at ¶ 4; Wamser Aff. at ¶ 5.) The omissions, which were also addressed in the circular, included: (1) That the success of Bionetics hinged in substantial part upon Martin E. Marks–(Bionetics' president and chief executive officer) remaining with the company, but that Mr. Marks did not have an employment agreement with Bionetics and defendants had concern that he might leave the company; (2) that a significant portion of the funds raised from the private offering would be used to pay existing debts of Bionetics (including deferred executive bonuses); (3) that Bionetics was merely negotiating contracts with Burroughs Wellcome and other potential distributors at the time of the offering; (4) that FDA approval had not been obtained or that FDA approval was necessary in order to "mass market" Bionetics' blood testing equipment and kits; (5) that Bionetics was in an extremely precarious financial position at the time of the offering and its economic viability depended in critical part upon being able to sell significantly greater numbers of its products in the short term future than it had ever sold before; and (6) that defendants determined the minimum amount necessary to be raised in the offering based on their belief that Bionetics would need only six to nine months to bring its products to market, or that the amount to be raised in the offering would only provide Bionetics with working capital for a six to nine month period. (PFOF at ¶ 5.)

Even if the Court finds that the written disclaimers trump the foregoing oral representations or omissions, Wamser also claims there is a genuine issue of material fact concerning whether he was provided with the private placement memorandum prior to his investment. (Resp. at ¶ 5.) Although the subscription agreement was completed and signed by Wamser himself, acknowledging receipt of the placement memorandum, he now argues that he could not have received and read it prior to investing.[3] (Id.)

---

3. Wamser argues that at some point in time after he typed-in his responses to the subscription

agreement and returned it to the defendants, the subscription agreement was affixed to the only

## ANALYSIS

█ The party moving for summary judgment must "show that there is no genuine issue as to any material fact and that [he] is entitled to summary judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must construe the evidence presented on the motion in favor of the non-movant and give the non-movant the benefit of all favorable inferences that can be drawn from it. However, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510. While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### I. MATERIALITY

§ 12(2) of the 1933 Act imposes liability on any person who offers or sells a security "... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading...." 15 U.S.C. § 77*l* (2). As regards summary judg-

ment, the parties focus extensively upon whether "loss causation" and/or "justifiable reliance" are necessary elements in a 12(2) claim. Defendants argue that they are, principally citing *Bastian v. Petren Resources Corp.,* 892 F.2d 680 (7th Cir.1990), *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317 (7th Cir.1988), *Ambrosino v. Rodman & Renshaw, Inc.,* 972 F.2d 776 (7th Cir.1992), *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522 (7th Cir.1985), and *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511 (10th Cir.1983). Wamser argues they are not, claiming they are elements of a 10b–5 securities claim and not a claim under § 12(2). This distinction is based on the different remedies allowed by these two types of securities claims, *i.e.,* § 12(2) provides only for rescission damages (you get your money back) while 10b–5 allows for special damages. Wamser principally cites *Bastian, Nielson v. Greenwood,* (N.D.Ill.1993), Hicks, *Civil Liabilities: Enforcement & Litigation Under the 1933 Act,* and IX L. Loss & J. Seligman, *Securities Regulation* (1992 Ed.); *see also,* cases cited in fn. 6 of plaintiff's brief.

The Court does not decide the issue as framed by the parties. In the context of the facts of this case, where the alleged misrepresentations and omissions were directly contradicted or cured by written statements contained in the placement circular, it is imprecise to frame the issue as one of causation or reliance. It is better described as an issue of materiality: Namely, the materiality of the alleged misrepresentations and omissions, and by extension, the materiality of the factual dispute over whether the misrepresentations and omissions occurred.[4]

█ Under the federal securities laws, the seller of a security is only liable for his misrepresentations or omissions as to facts which are *material. Acme Propane,* 844

---

copy of the placement memorandum which has ever been in Wamser's possession. (Resp. at ¶ 5.) Because Wamser does not recall whether he was provided with the placement memorandum prior to his purchase of Bionetics' stock, and because Wamser had no means of placing a spiral binder on a placement memorandum, he asks the Court to infer that the defendants caused the completed subscription agreement to be affixed to the placement memorandum as a

"package". (Id.) The "package" was then returned to Wamser some time *after* his investment. (Id.)

4. Indeed, the 7th Circuit has "observ[ed] that 'reliance' in securities law is just a code word for causation, which in turn usually means a material misstatement...." *Acme Propane,* 844 F.2d at 1322.

F.2d at 1322. A *material* misstatement or omission is one that "significantly alter[s] the total mix of information available to the investor." *Id.* In *Acme Propane*, a 12(2) case, this meant that oral misrepresentations or omissions were not material, as a matter of law, when they were directly contradicted by written statements and warnings provided to the buyer prior to investing:

> An investor who knew the truth is hard put to say that the inconsistent oral statement significantly altered the total mix of information. Second, the securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires. Just as in the law of contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement. Otherwise, even the most careful seller is at risk, for it is easy to claim: "Despite what the written documents say, one of your agents told me something else." If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.

*Id.* In *Ambrosino*, the district court dismissed a 12(2) claim on grounds that the untrue and/or omitted information was not "material" because the true and/or missing information was provided in the offering memoranda. *Ambrosino*, 972 F.2d at 785. The 7th Circuit affirmed, describing immateriality under these circumstances as the absence of a "legal cause of injury":

> At oral argument the plaintiffs asserted the district court erred by placing too much reliance on the private offering memoranda and not enough on oral representations. Similarly, they urged us to look to what they were told, or not told, and to not rely on the printed offering, but that is not the law. In *Teamsters* ..., we stated, "The principle that the written statement controls the oral one is a staple of contract law, and we agree ... that it should be in securities law as well." Consequently, "[w]hen the issuer discloses the truth, an oral variance is not a legal cause for injury."

*Id.*, at 786.[5] (Citations omitted.)

In essence, *Acme Propane* and *Ambrosino* hold that the "truth" contained in a written document supplied to the buyer "cure[s] any falsehood" contained in seller's oral statements or omissions. *Acme Propane*, 844 F.2d at 1325. The "total mix" of information is not altered by such misrepresentations and omissions because, as a matter of law, they are not considered part of the total mix. Wamser argues, however, that such a rule is inconsistent with Congress' intention to heighten the liability of sellers, make sellers more accountable, and require sellers to act as guarantors in order to enhance the accuracy and reliability of the information they provide. But where written, accurate and truthful information is provided to the buyer, information that contradicts oral misstatements and cures alleged omissions, Congress' objective has been met. To hold otherwise would extend the accountability of sellers far beyond that which is fair and which the language of the statute intends.[6]

---

**5.** Wamser tries to distinguish *Acme Propane* and *Ambrosino* on the grounds that the 7th Circuit failed to address the important distinctions between 10b–5 and 12(2) claims and simply stated their holdings "in a conclusory fashion". The 7th Circuit failed to discuss any distinctions between 10b–5 and 12(2) claims because its holdings in these two cases were based on materiality, not reliance or causation. Materiality is clearly an element of both 10b–5 and 12(2) claims. The Court is also not sure what plaintiff means by the term "conclusory". The holdings in these two cases are certainly "conclusory" in the sense that they state a conclusion. All holdings do that. The Court's reasoning, however, was not conclusory and instead was logically explained as a corollary of the basic contract principle that written documents always trump oral statements.

**6.** Even the Loss and Hicks treatises, which plaintiff quotes extensively, implicitly recognize the correctness of this decision. Loss states that, under 12(2), buyers "do not have to prove 'reliance' on the misstatement or omission; *they must show only that they did not know of it*...." Loss at 4202. Hicks similarly states that one of the elements of a 12(2) claim is "lack of knowl-

The fact that the misrepresentations and omissions at issue were not material has a direct impact upon the Court's summary judgment analysis. That is, the parties dispute whether or not such misstatements and omissions actually occurred. But as explained above, there is no liability even if they did occur. Thus, the factual dispute is not "outcome determinative", *i.e.*, it is not material and it does not preclude summary judgment.

## II. GENUINENESS

■ In the alternative, Wamser argues that there is a genuine dispute of material fact as to whether or not he actually received the offering circular before investing in Bionetics. Such a dispute is clearly material. The preceding discussion is premised entirely on the notion that Wamser received and read the circular prior to investing. But is it genuine? Here the Court must consider the developing principles governing such a determination.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* Rather, the standard for summary judgment is now the same as that for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

Applying these principles to the case at hand it becomes clear that the dispute at issue is not genuine. Dougherty clearly and specifically testified that he gave Wamser an offering circular in a face-to-face meeting with Wamser prior to his decision to invest in Bionetics. (Dougherty Dep. at 30, 33–34.) He also testified that he tried to go through the circular with Wamser, but Wamser did not have time and stated that he would read through it on his own. (Id.) More importantly, Wamser personally typed his responses to questions contained in the subscription agreement, one of which stated that he had received, read and understood the offering circular prior to investing in Bionetics. Despite these clear statements to the contrary, Wamser now claims that he no longer remembers whether or not he saw an offering circular prior to investing in Bionetics.[7] (Wamser Dep. at 40.) Having lost his memory of the matter, Wamser then tries to recreate a scenario wherein the defendants attach the circular to the subscription agreement *after* he fills it in and *after* he purchases the stock. Wamser bases this scenario on the single argument that the circular could not have been so attached prior to his signing of the subscription agreement because he composed his responses thereto on a typewriter one page at a time, which would have been impossible with the circular attached. But

edge by the plaintiff of the untrue statements or omissions at the time of purchase of the security". Hicks at § 6.07. Obviously, where a buyer is provided with a writing containing the complete truth prior to purchase, which truth contradicts or cures whatever untrue oral statements or omissions that may have occurred, a buyer "has knowledge" of the falsity and incompleteness of the oral statements.

7. Note that this is not a denial of Dougherty's testimony or his own prior statement. It is simply a statement that he—Wamser—does not remember whether he received the circular prior to investing.

there are several possible explanations for the fact that the documents are currently attached.[8] These explanations are not important. What is important is the Court's assessment that it would be unreasonable for a jury to adopt the explanation offered by Wamser in direct contradiction to his own prior, contemporaneous statement and the clear · testimony provided by Dougherty. This is especially true where Wamser simply draws a blank as to the timing of his initial receipt of the circular. The 7th Circuit has repeatedly stated that "a party should not be allowed to create issues of credibility by contradicting his own earlier testimony."[9] *Essick v. Yellow Freight Systems, Inc.*, 965 F.2d 334, 335 (7th Cir.1992), quoting *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir.1985). "In so holding, [the 7th Circuit] noted that if [it] allowed a party to create a genuine issue of material fact by changing his prior testimony: the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Id.* On this record, the evidence is so one-sided that a reasonable jury could not return a verdict in Wamser's favor. Even though "[t]he trial court must view all evidence in the light most favorable to the party opposing the motion for summary judgment ... drawing all inferences in favor of the nonmovant", *Santiago v. Lane*, 894 F.2d 218, 221, (7th Cir.1990), the Court is not required to allow a case to go to trial on the possibility of a verdict that it would consider inherently unreasonable. Defendants' motion must be granted and the federal claims dismissed. Those claims being dismissed, the state law claims must also be dismissed for lack of jurisdiction.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendants' motion for summary judgment is granted and the case is dismissed.

**SO ORDERED.**

---

8. Not the least of which is the possibility that Wamser sent both the completed subscription agreement and the offering circular—unattached—back to Liss after he read the circular and signed the agreement, but before making the investment. Liss then could have attached the documents together as currently found.

9. While *Essick* and the cases cited therein dealt with sworn testimony, Wamser's responses to the subscription agreement were contemporaneous with the events in question and bear a degree of reliability similar to the "present sense impression" and "excited utterance" exceptions to the hearsay rule. F.R.E. 803(1) & (2).