[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1182 
This is a securities-fraud case. After Burt Blackmon purchased stock in Nexity *Page 1183 
Financial Corporation ("Nexity"), he sued Nexity and its directors and officers, alleging that they had misrepresented and failed to disclose material facts when he purchased his stock. The trial court entered a summary judgment in favor of Nexity and its directors and officers. Blackmon appeals; we affirm.
 I. Facts and Procedural History
Nexity was incorporated in 1999 as a Delaware corporation. Nexity is a holding company that owns Nexity Bank; Nexity Bank operates banks in various cities in Alabama. In January 2000, Nexity Bank started its Internet banking operations, and by February 2000 Nexity Bank was operating primarily as an "Internet bank."
By the end of 1999, Nexity had incurred a net operating loss of $5,657,287, and it decided to raise capital through a private offering of its stock. In connection with the private stock offering, Nexity issued a private-offering memorandum ("POM"), dated March 8, 2000. The POM described the stock offering, Nexity's business, and the risks associated with the investment. Nexity supplied potential investors with copies of the POM.
At $5 per share, Nexity sought to raise between $15,000,000 and $25,000,000 through the private stock offering. The POM states that the offering would terminate no later than May 30, 2000, unless Nexity extended the deadline by written notice to the subscribers to the stock.
The POM includes Nexity's financial statement for the period from March 12, 1999 (the incorporation date), through December 31, 1999, which shows a net operating loss of $5,657,287. Nexity did not disclose in the POM its budget for the year 2000, nor did it state how close it was coming to that budget as of the issuance date of the POM. As of May 2000, Nexity's budget showed a loss of $637,990; in actuality, Nexity had incurred a net operating loss of $2,465,385 as of May 2000.
The POM contains several positive forward-looking statements. For example, the POM stated that the "use of the Internet . . . is expected to continue to grow . . . [and] the number of Internet users is expected to increase from 29.2 million in July 1997 to 232 million in 2001," and that "[Nexity] believes the number of electronic banking households will grow substantially in the next several years." It further asserted that "[Nexity] believe[s] that only a relatively small number [of banks] have the capability to transact banking business over the Internet" and that "[t]he growth of the Internet and the speed, flexibility and convenience it offers may provide [Nexity] with a competitive advantage over traditional banks."
The POM states that words such as "believe" and "expect" identify forward-looking statements and that such statements "are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such statements." The POM also contains the following warning at the beginning, in boldfaced type: "An investment in [Nexity] involves a high degree of risk." It also states in boldfaced type that the investors should "consider [Nexity's] prospects in light of the risks, expenses and difficulties frequently encountered by companies in their early stages of development, particularly companies in the new and rapidly evolving market for electronic financial services such as banking." The POM further states that Nexity will require each potential investor to represent, prior to the purchase of stock, that "he or she recognizes that this investment is highly speculative *Page 1184 
and that it could result in a total loss of his or her investment."
The POM sets forth nine pages of "risk factors." The POM points out that Nexity had a limited operating history, with a net operating loss for the year 1999. The POM states that Nexity has been engaged in Internet banking since only February 2000. The POM advises the investors to "consider [Nexity's] prospects in light of the risks, expenses, and difficulties frequently encountered by companies in their early stages of development, particularly companies in the new and rapidly evolving market for electronic financial services such as banking." The POM also warned that Nexity did not intend to pay dividends "in the foreseeable future" and that Nexity did not expect "to realize a profit during its initial years of operation."
The POM further cautions that "demand and market acceptance for Internet banking are subject to a high level of uncertainty" and that "there can be no assurance that Internet banking will become widespread . . . [or] that the usage trends currently experienced will continue to be realized for electronic banking or commerce." The POM points out that "[b]ecause the market for Internet banking is new and evolving, it is difficult to predict the future growth rate"and that "[i]f the market does not continue to grow," Nexity could be adversely affected. The POM warns that Nexity may not have identified or considered all of its present and future competitors. The POM states that "[m]any of [Nexity's] competitors have substantially greater financial resources than Nexity."
The POM also warns that Nexity may have to raise additional capital "through public or private financings," which, it warns, may be on terms unfavorable to Nexity. Although Nexity "anticipates that [it] may seek additional capital through a public offering of its common stock sometime in the latter part of 2000," the POM states, "no decision regarding such offer has been made . . . [and] [t]here is no assurance that a public offer can be made on terms . . . acceptable to Nexity." Thus, the POM points out that Nexity's stock might not be traded publicly and that if it is not the investors "will be limited in their ability to resell shares."
On May 30, 2000, Nexity issued its first supplement to the POM ("the supplement"). The supplement advised the investors that the offering was extended to June 15, 2000, instead of May 30, 2000. The supplement also lowered the minimum offering to $10,000,000. Nexity allowed investors the opportunity to cancel their stock subscriptions up until June 5, 2000.
Blackmon received the supplement; he chose not to cancel his subscription of Nexity stock, and on May 31, 2000, he signed a subscription agreement.[1] Blackmon purchased 150,000 shares of Nexity stock for a total purchase price of $750,000. Before Blackmon purchased the Nexity stock, he spoke with an officer of Nexity, Ken Vassey, about the prospect of Nexity's conducting an initial public offering ("IPO"). Blackmon testified at his deposition that Vassey expressed optimism that an IPO would occur. However, Blackmon admitted that no one promised him that Nexity would conduct an IPO.
Before purchasing the Nexity stock, Blackmon also spoke with Nexity's president, *Page 1185 
David Long, and its chief executive officer, Greg Lee, regarding the supplement. He specifically asked them why Nexity had extended the offering and lowered the amount of the minimum offering. Blackmon testified at his deposition that they told him that Nexity lowered the minimum amount to be raised from the offering to $10,000,000 in order to "break escrow" and to have access to that amount immediately rather than having to wait for $15,000,000 to be raised. Blackmon testified that they assured him that Nexity expected to receive $15,000,000 by June 15, 2000. However, he also testified that he understood from the supplement that Nexity might not raise $15,000,000.
At some point before his purchase, Blackmon inquired generally about how Nexity was doing. Blackmon testified at his deposition that Lee told him in general terms that "Nexity was doing fine and things were progressing as per their plans." Blackmon further testified that he understood the comment to refer to Nexity's "general strategic plan that they had within the bank" and that he did not receive any details about the strategic plan. He also testified that he believed Nexity had a budget or financial information that was not included in the POM. However, he did not ask to see Nexity's budget, its model, or a financial statement before his purchase.
Nexity closed its offering on June 15, 2000; it raised approximately $11,000,000. Lee and Long testified that the minutes of the August 16, 2000, meeting of Nexity's board of directors reflect that the private stock offering was closed as of June 15, 2000. The minutes also reflect that the board of directors authorized additional investors to join until September 15, 2000. However, both Lee and Long testified that Nexity did not sell any additional shares after June 15, 2000.
Blackmon claimed that Nexity offered a "side deal" to potential institutional investors during the period of the stock offering. He described the "side deal" as Nexity's offer, made to institutional investors, i.e., banks, that had purchased Nexity stock, of an opportunity also to purchase loan participations. He explained that institutional investors would gain returns from loan participations and earn back the purchase price of their stock. Blackmon testified that Nexity did not offer a similar opportunity to individual investors. Blackmon admitted that, even if Nexity had offered individual investors the opportunity, however, he could not have participated in it.
Nexity did not conduct an IPO in late 2000, and, for that year, it incurred a net operating loss of approximately $5,400,000.[2]
On November 20, 2002, Blackmon sued Nexity, Lee, Long, and Nexity's directors, John J. Moran, Randy K. Dolyniuk, John W. Collins, and Denise N. Slupe (collectively "the Nexity defendants").[3] He alleged (1) that the Nexity defendants violated § 8-6-19(a)(2), Ala. Code 1975, when they sold stock to him by misstating or *Page 1186 
omitting material facts, and (2) that the individual defendants violated § 8-6-19(c), Ala. Code 1975, as directors and/or officers of Nexity by conducting the private stock offering in 2000, by preparing and distributing the POM and the supplement, which he says misstated or omitted material facts, and by materially aiding Nexity in its violation of § 8-6-19(a), Ala. Code 1975. Blackmon sought a recovery of his $750,000 investment with 6% interest, reasonable attorney fees, and other appropriate costs.
In his complaint, Blackmon alleges the following facts as to the Nexity defendants' misrepresentations and omissions:
(1) The POM and the supplement failed to provide or to update Nexity's financial information for the year 2000, instead including only Nexity's 1999 Annual Report and "positive, glowing representations concerning consumer use of the Internet, Internet-based businesses in general, and Nexity Bank's prospects as an Internet bank in particular";
(2) The supplement failed to disclose that Nexity had lowered its minimum stock offering from $15,000,000 to $10,000,000 because it could not attract sufficient investors to reach that goal;
(3) The supplement failed to disclose that Nexity's inability to raise a minimum of $15,000,000 would force it to seek additional capital at a lower price per share, diluting the value of existing shares; and
(4) Nexity's officers orally assured Blackmon that Nexity would conduct an IPO later in 2000 and the POM stated that Nexity might conduct an IPO in the latter part of 2000, but the supplement failed to disclose that Nexity would not be able to conduct an IPO in the latter part of 2000, though that fact was known to the Nexity defendants when the supplement was issued.
On May 10, 2004, the trial court entered a scheduling order, setting the following deadlines: (1) May 1, 2005, as the discovery cut-off date; (2) May 15, 2005, as the deadline for filing any amendments to the pleadings; and (3) the week beginning June 13, 2005, as the trial setting for the case.
On September 21, 2004, the Nexity defendants deposed Blackmon. In April 2005, he in turn deposed Long, Vassey, and Lee. Upon indication from Blackmon that he intended to amend his complaint, the trial court, on April 29, 2005, amended its scheduling order. The amended scheduling order set May 5, 2005, as the dead-line for Blackmon to file an amended complaint, and it set the case for trial during the week of August 8, 2005. On May 5, 2005, Blackmon filed his amended complaint.
In the amended complaint, Blackmon added claims of fraud, fraudulent suppression, and breach of contract against the Nexity defendants. In addition to the relief requested in the original complaint, Blackmon sought punitive damages of $1,000,000. Blackmon also added the following new factual allegations as to the Nexity defendants' alleged misrepresentations and omissions:
(1) That the supplement failed to disclose that Nexity's loss for May 2000 was worse than projected in Nexity's internal budget;
(2) That the POM and the supplement failed to disclose that Nexity was offering "side deals" to potential institutional investors by offering to sell them loan participations;
(3) That the Nexity defendants had no intention of closing the offering on June 15, 2000, as the supplement provided; *Page 1187 
(4) That a senior manager of Nexity orally represented to Blackmon that Nexity was doing well financially, that it was "on budget" and progressing according to plan for 2000, and that the likelihood of conducting an IPO in the latter part of 2000 was strong; and
(5) That Blackmon accepted June 15, 2000, as the new deadline for the private stock offering by signing the notice attached to the supplement, and that Nexity was required to but did not notify Blackmon in writing that the offering had been extended to September 15, 2000.
The Nexity defendants moved to disallow Blackmon's amended complaint or, in the alternative, sought leave to conduct additional discovery regarding the amended claims. Blackmon opposed that motion. On June 14, 2005, the trial court granted the Nexity defendants' motion to disallow the amended complaint, finding that "[Blackmon was] aware of facts justifying the amended complaint when the original complaint was filed. To allow the amendment now would require a substantial delay of the trial setting to allow additional discovery."
The Nexity defendants then moved for a summary judgment on all the claims in the original complaint. Blackmon opposed the motion. After a hearing, on July 22, 2005, the trial court granted the motion and entered a summary judgment for all the Nexity defendants.[4] Blackmon appeals.
 II. Standard of Review
We review a summary judgment de novo, and we apply the same standard the trial court applied to determine "`whether the evidence before [it] made out a genuine issue of material fact.'"Story v. RAJ Props., Inc., 909 So.2d 797, 801 (Ala. 2005) (quoting Bussey v. John Deere Co., 531 So.2d 860, 862
(Ala. 1988)). *Page 1188 
"When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue." 909 So.2d at 801. "Substantial evidence" is evidence of "`such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" 909 So.2d at 801 (quotingWest v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989)). We must review the evidence in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. 909 So.2d at 802.
In reviewing the trial court's grant or denial of leave to amend a pleading, we must determine whether the trial court exceeded its discretion. Boros v. Baxley, 621 So.2d 240, 245
(Ala. 1993). We review a trial court's conclusions of law de novo.BT Sec. Corp. v. W.R. Huff Asset Mgmt. Co.,891 So.2d 310, 312 (Ala. 2004).
 III. Analysis
Blackmon argues that the trial court erred in disallowing his timely filed amended complaint and in granting the Nexity defendants' summary-judgment motion as to Blackmon's claims under § 8-6-19(a), Ala. Code 1975. We first review whether the trial court erred in disallowing Blackmon's amended complaint.
 A. Amendment of Complaint
Pursuant to Rule 16(b), Ala. R. Civ. P., the trial court "may enter a scheduling order that limits the time . . . to amend the pleadings." In this case, the trial court entered a scheduling order and an amended scheduling order setting a specific deadline for Blackmon to file his amended pleading. Blackmon argues that because he filed his amended complaint within the deadline set by the trial court in its scheduling order, the trial court did not have discretion to disallow the amendment on the basis of undue delay. That is, Blackmon argues that the trial court was required to accept his complaint as timely filed. We do not believe that this is the standard.
Blackmon correctly points out that Rule 15(a), Ala. R. Civ. P., governs this case. Rule 15(a) states, in pertinent part:
 "Unless a court has ordered otherwise, a party may amend a pleading without leave of court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forty-two (42) days before the first setting of the case for trial, and such amendment shall be freely allowed when justice so requires. Thereafter, a party may amend a pleading only by leave of court, and leave shall be given only upon a showing of good cause."
Blackmon argues that the timetable in Rule 15(a) is inapplicable in this case because the trial court entered a scheduling order setting forth a different deadline for filing an amended pleading. We agree. The trial court here "ordered otherwise" by setting in its scheduling order a different deadline for filing an amended complaint. Under the trial court's original scheduling order, the latest a party was to be allowed to file an amended pleading without the trial court's leave was May 15, 2005-29 days before the first setting of the case for trial. Under the trial court's amended scheduling order, the latest Blackmon was allowed to file an amended complaint without the trial court's permission was May 5, 2005, and the trial date *Page 1189 
was moved from the week of June 13 to the week of August 8, 2005. Thus, first the May 15 deadline and then the May 5 deadline was substituted for the default provision in Rule 15(a).
Blackmon incorrectly assumes, however, that he could freely amend a pleading under Rule 15(a) so long as he filed the amendment within either the deadline set by Rule 15(a) or by the court. That is not the correct standard. Rule 15(a) states that the amendment shall be "freely allowed when justice so requires" and that the amendment is subject to disallowance on the trial court's or opposing party's motion.
We have held that there is an "overarching liberal policy of allowing amendments under Rule 15." Ex parte Liberty Nat'lLife Ins. Co., 858 So.2d 950, 954 (Ala. 2003). However, Rule 15 `"is not carte blanche authority to amend . . . at any time.'"Burkett v. American Gen. Fin., Inc., 607 So.2d 138, 141
(Ala. 1992) (quoting Stallings v. Angelica Uniform Co.,388 So.2d 942, 947 (Ala. 1980)). The trial court has discretion to deny an amendment for good cause. Ex parte GRE Ins.Group, 822 So.2d 388, 390 (Ala. 2001); Stallings,388 So.2d at 947. The deadline in the scheduling order does not curtail the trial court's discretion in considering the merits of the offered amendment. See Moses.com Sec, Inc. v.Comprehensive Software Sys., Inc., 406 F.3d 1052, 1066 (8th Cir.2005) (holding that "the scheduling order merely prescribes the date by which all [motions to amend] `shall be filed;' the date on the scheduling order does not confine the district court's consideration of the merits of such motions and does not preclude it from finding that an amendment would result in prejudice"). The trial court can refuse to allow an amendment if allowing it would result in actual prejudice to the opposing party or for reasons of "undue delay." GRE Ins. Group,822 So.2d at 390.
Undue delay can have two different meanings in a case. First, the trial court has discretion to deny an amendment to a pleading if allowing the amendment would unduly delay the trial. Hortonv. Shelby Med. Ctr., 562 So.2d 127, 130 (Ala. 1989). Second, an unexplained undue delay in filing an amendment when the party has had sufficient opportunity to discover the facts necessary to file the amendment earlier is also sufficient grounds upon which to deny the amendment. Stallings, 388 So.2d at 947;see also Rector v. Better Houses, Inc., 820 So.2d 75, 78
(Ala. 2001) (holding that the trial court properly struck the amended complaint when the plaintiff offered no reason to refute the trial court's finding that the new allegations in the amended complaint were based on facts the plaintiff had known since the beginning of the action); Burkett, 607 So.2d at 141
(holding that the trial court did not exceed its discretion in striking the amended complaint where the plaintiffs had learned of the facts underlying the new allegations six months before they attempted to amend).
The trial court in this case denied the amendment on both theories of undue delay. The trial court found that Blackmon was aware of the facts justifying the amended complaint when he filed his original complaint. Blackmon does not show that when he filed his original complaint he was unaware of the factual allegations added in the amended complaint. In fact, Blackmon argues that there was no actual prejudice to the Nexity defendants by the *Page 1190 
amendment because the new factual assertions were based on Blackmon's deposition testimony. Blackmon argues that the Nexity defendants were aware of Blackmon's testimony for at least eight (8) months before Blackmon's amendment, and that the Nexity defendants, therefore, could not have been surprised by the amendment. Blackmon, however, is addressing a theory on which the trial court did not rely in denying the amendment — actual prejudice to the Nexity defendants. The trial court relied instead on undue delay as a reason for denying the amendment. Blackmon's argument in fact supports the trial court's finding that Blackmon was aware of the new factual allegations that he stated in the amendment but that he delayed unduly in filing the amendment and offered no explanation for his tardiness.
The trial court further found that the amendment would require additional discovery and would substantially delay the trial setting. Blackmon had attempted to add three additional claims to his amended complaint. The Nexity defendants argued that they would need additional discovery with respect to these claims and had moved — as an alternate to disallowance of the amendment — for additional time for discovery. Blackmon did not show that the Nexity defendants did not need the additional discovery in order to prepare for trial. Instead, he argues that he made himself available for additional deposition, if additional discovery was necessary, and that the Nexity defendants had ample time to prepare. The point, however, is not Blackmon's availability for discovery, but that the additional discovery might necessarily delay the setting of the case for trial.
We decline to hold, as Blackmon urges, that a scheduling order establishes the date up until which a party may automatically amend a pleading, regardless of prejudice to the other party or undue delay. We hold instead that, although the trial court should freely allow the amendment of pleadings within the time set in the scheduling order, the trial court has discretion, in the interests of justice, to deny an amendment for reasons of prejudice or undue delay. This standard is consistent with our past interpretation of Rule 15(a), Ala. R. Civ. P. Blackmon fails to show that he did not unduly delay filing his amendment and that the amendment will not delay setting the case for trial; therefore, we hold that the trial court did not exceed its discretion in disallowing Blackmon's amended complaint.
 B. Alleged Material Misrepresentations or Omissions in Violation of § 8-6-19(a)(2), Ala. Code 1975
Blackmon argues that the trial court erred in entering the summary judgment in favor of the Nexity defendants on his claims made under the Alabama Securities Act, § 8-6-1 et seq., Ala. Code 1975. Blackmon contends that he presented substantial evidence indicating that Nexity and its officers misrepresented and omitted several material facts in the sale of its stock. Blackmon argues that at the very least there is a factual dispute that requires a jury determination.
Blackmon argues that the Nexity defendants violated §8-6-19(a)(2), Ala. Code 1975, which states:
 "(a) Any person who:
 ". . . .
 "(2) Sells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to *Page 1191 
make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission,
 "is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition."
Thus, a claim of a violation of § 8-6-19(a)(2), Ala. Code 1975, requires (1) a sale or an offer to sell a security (2) by means of a false statement or omission (3) of material fact and (4) the ignorance of the buyer as to the untruth or omission.
The parties dispute whether the Nexity defendants made misrepresentations and omissions of "material" facts.
 1. Applicable Standard of Materiality
Because there are few Alabama cases construing the Alabama Securities Act, we review federal cases construing federal securities law to aid in properly interpreting the corresponding provisions of the Alabama Securities Act. See Buffo v.State, 415 So.2d 1158, 1162 (Ala. 1982) (holding that because there are few Alabama cases construing § 8-6-17, Ala. Code 1975, federal cases should be reviewed). Section 8-6-19(a)(2), Ala. Code 1975, is similar to § 12(a)(2), Securities Act of 1933, codified as 15 U.S.C. § 771(a)(2). See Banton v.Hackney, 557 So.2d 807, 826 (Ala. 1989) (stating that §8-6-19(a)(2), Ala. Code 1975, is similar to § 12(2) of the Securities Act of 1933).[5] Thus, we look to federal cases that have interpreted "materiality" under § 12(a)(2) of the Securities Act of 1933.
The standard of "materiality" is the same for various provisions of federal securities law, including § 12(a)(2) of the Securities Act of 1933. See Rombach v. Chang,355 F.3d 164, 178 n. 11 (2d Cir.2004) (stating that the standard for a materially misleading statement is the same under § 12(a)(2), § 10(b), and § 11). Specifically, federal courts have adopted the materiality standard of § 14 of the Securities Exchange Act of 1934 as set forth in TSCIndustries, Inc. v. Northway, Inc., 426 U.S. 438,96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in construing various provisions of federal securities law, including the provisions of the Securities Act of 1933. Goss v. Clutch Exch., Inc., 701 P.2d 33, 36 (Colo. 1985) (citing various federal cases).
Under TSC Industries, Inc., a misrepresentation or omission of fact "is material if there is substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 426 U.S. at 449, 96 S.Ct. 2126. Moreover, "[t]here must be a substantial likelihood that the disclosure of the omitted fact would have *Page 1192 
been viewed by the reasonable investor as having significantly altered the `total mix' of information made available."426 U.S. at 449, 96 S.Ct. 2126 (footnote omitted).
The jury generally determines materiality as a question of fact, but alleged misrepresentations may be immaterial as a matter of law if the trial court determines that no reasonable investor could have been swayed by the alleged misrepresentation or omission. In re Amdocs Ltd. Sec. Litig., 390 F.3d 542,547 (8th Cir.2004); see also Pomes v. Gateway 2000,Inc., 122 F.3d 539, 546-48 (8th Cir.1997) (explaining situations where materiality is not necessarily a factual question for a jury when a misrepresentation or an omission is immaterial as a matter of law). Specifically,
 "[a]lleged misrepresentations and omissions can be immaterial as a matter of law if they: 1) are of such common knowledge that a reasonable investor can be presumed to understand them; 2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; 3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or 4) are accompanied by sufficient cautionary statements."
Amdocs Ltd., 390 F.3d at 548.
Cautionary statements must relate directly to the alleged misrepresentations or omissions to render them immaterial as a matter of law. Amdocs Ltd., 390 F.3d at 548; seealso Parnes, 122 F.3d at 548 (stating that the "bespeaks caution doctrine" provides that misrepresentations or omissions are immaterial if sufficient, specific cautionary statements accompany the alleged misrepresentations and omissions). In determining materiality, we do not "attribute to investors a childlike simplicity." Parnes, 122 F.3d at 547.
 2. Alleged Misrepresentations or Omissions
Blackmon argues that he came forward with substantial evidence indicating that the Nexity defendants misrepresented or omitted five material facts. After reviewing each of those five instances, we conclude that his arguments are unpersuasive.
 i. Nexity's Financial Performance in 2000
Blackmon argues that Lee, Nexity's chief executive officer, personally assured him that "Nexity was doing well and it was progressing per [its] model [and] their budget [was] on plan."[6] He contends that this was a material misrepresentation because Nexity had a net operating loss of approximately $2,400,000 as of May 2000, exceeding its internal projected loss as of that date. Blackmon further argues that the net operating loss of $5,657,287 in 1999 was not indicative of the loss Nexity might incur in the future because he understood from one of the notes in the financial statement that over $4,000,000 of that loss was due to a one-time, nonrecurring compensation expense to Nexity's founders.
Review of Blackmon's deposition testimony reveals that he understood from the Nexity officers that the company was progressing according to its general strategic plan. Nexity officers apparently stated *Page 1193 
only in general terms that Nexity was doing well. The following is an excerpt from Blackmon's deposition transcript:
 "A: . . . I had conversations with Ken [Vassey] about how Nexity was doing, and he assured me that Nexity was doing fine, that all they needed was the capital to continue their growth and profitability. I want to say I had one conversation via telephone with Greg [Lee] and received general assurances from Greg that Nexity was doing well. Verbally at the meeting that I had with David [Long] and Greg on May 30th, I again got verbal updates on Nexity that Nexity was doing fine and things were progressing as per their plans. But I did not receive anything in writing.
 "Q: Now, when you say Nexity was progressing as per their plans, do you mean the plans as outlined in the offering memorandum?
 "A: No. As per their general strategic plan that they had within the bank is what I understood them to say.
 "Q: In what respect, if any, was that different than what was said about the plans in the offering memorandum?
 "A: I guess the main thing that was different is that their plan — strategic plan, their budget, their model had more financial forward-looking information in it than the prospectus did. The prospectus virtually had no forward-looking financial information with it.
 ". . . .
 "A: . . . But with Mr. Lee, the question led into what was I told, I believe was your question, or the question was what was I told or what did I receive from them. And the conversation moved to what I was told. And I was told that Nexity was progressing as per their model and doing well, general comment.
 "Q: Was that the extent of what you were told, that's as specific as it got?
 "A: That's correct. Now, your other question — your other question is are you telling me that Nexity — or you asked me a question, are you telling me that Nexity had budgeted or had financial information that was not included in the prospectus, I believe that was your question. And the answer is yes, they did.
 "Q: All right. And my question really was did Mr. Lee or anybody else at Nexity before you made your investment tell you that such information, in fact, existed?
 "A: The only thing I was told was that Nexity was doing well and that it was progressing as per their model or their budget on plan."
Blackmon admitted that he had not asked to review Nexity's strategic plan or budget. Given the vague generality of the representation that Nexity was "progressing as per their model or their budget [was] on plan," no reasonable investor would rely on it. See Hillson Partners Ltd. P'ship v. Adage, Inc.,42 F.3d 204, 213-16 (4th Cir.1994) (holding that vague "on schedule" and "on track" statements were immaterial misrepresentations);see also Glassman v. Computervision Corp., 90 F.3d 617,631 (1st Cir.1996) (holding that federal securities law focuses on disclosure of backward-looking hard information, not on information such as internal projections and budgets and that "[t]he mere fact that intraquarterly results lagged behind internal projections does not, without more, require disclosure").
Blackmon received the POM, which contained a number of cautionary *Page 1194 
statements, including the statements that Nexity may suffer losses during the first few years of operations, that Nexity had incurred a loss in the previous year, and that investment in Nexity was highly speculative. These cautionary statements sufficiently related to the alleged misrepresentations so as to render them immaterial. See Amdocs Ltd., 390 F.3d at 548
(stating that if cautionary statements relate to the alleged misrepresentations, such cautionary statements render the misrepresentations immaterial). Furthermore, written cautionary statements generally take precedence over contradictory oral representations and render the oral representations immaterial as a matter of law. See Carr v. CIGNA Sec., Inc.,95 F.3d 544, 547 (7th Cir.1996) (holding that if a literate adult is given a written document with warnings but is orally told something that contradicts those warnings, then that person cannot maintain an action for fraud against the issuer); see also Alfa LifeIns. Corp. v. Green, 881 So.2d 987, 992-93
(Ala. 2003) (holding that a person could not reasonably rely on oral representations that contradict a written document); Exparte Caver, 742 So.2d 168, 173 (Ala. 1999) (stating that a person cannot blindly rely on an agent's oral representations that are contrary to written disclosures); and Wamser v. J. E.Liss, Inc., 838 F.Supp. 393, 399 (E.D.Wis.1993) (holding that written information cures oral misstatements and omissions). Therefore, the alleged oral misrepresentations and omissions regarding Nexity's financial performance in the year 2000 were immaterial as a matter of law.
 ii. June 15, 2000, Closing
Blackmon argues that the Nexity defendants misrepresented the closing date of the offering as June 15, 2000, because Nexity actually allowed investors to purchase stock even after August 2000. Blackmon bases this argument on the new factual allegation in the stricken amended complaint. Because we hold that the amended complaint was properly disallowed, the trial court was correct in not addressing this argument. See Kaplan v.Rose, 49 F.3d 1363, 1370 (9th Cir.1994) (holding that the trial court properly refused to consider allegations in the disallowed amended complaints). Therefore, we do not consider this argument.[7]
 iii. Minimum Offering of $15,000,000
Blackmon argues that Nexity's officers misrepresented that it could raise the original minimum offering of $15,000,000. The trial court found that Blackmon "was aware that he could cancel or reduce his subscription and chose not to do so." Blackmon testified at his deposition (1) that he understood, after he received the supplement, that Nexity might not raise $15,000,000 and (2) that he voluntarily purchased Nexity stock even though he knew Nexity might not raise that amount. Blackmon received the supplement, which states that the offering minimum had been lowered to $10,000,000, and *Page 1195 
Blackmon testified that he understood that change. We will not attribute a "childlike simplicity" to investors in determining whether a misrepresentation or omission is material.Parnes, 122 F.3d at 547. In this case, the written notice in the supplement that the minimum offering was being lowered to $10,000,000 rendered any contrary oral misrepresentations immaterial. Carr, 95 F.3d at 547.
 iv. IPO in 2000
Blackmon claims that the Nexity defendants misrepresented the likelihood that Nexity would conduct an IPO in 2000. He argues that Nexity had not hired an investment advisor or otherwise prepared to conduct an IPO when it represented that it anticipated conducting an IPO. Thus, Blackmon argues, the Nexity defendants materially misrepresented that Nexity would conduct an IPO when there was no such prospect.
Although the POM and Ken Vassey, a Nexity officer, may have indicated that Nexity expected to conduct an IPO in the latter part of 2000, the POM also contained explicit warnings that such an IPO might never occur, The POM stated that "no decision regarding such offer has been made . . . [and] [t]here is no assurance that a public offer can be made on terms . . . acceptable to Nexity." Thus, Nexity pointed out that its stock might not be traded publicly and that, if it were not, the investors "will be limited in their ability to resell shares." These cautionary statements directly relate to the alleged misrepresentation at issue. Nexity's statements regarding the possibility of conducting an IPO in context with these cautionary statements would not have misled a reasonable investor. SeeP. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 98 (2d Cir.2004) (holding that cautionary statements neutralized any misrepresentations regarding future IPOs); Halperin v.eBanker USA.com, Inc., 295 F.3d 352, 357-58 (2d Cir.2002) (holding that representations and omissions must be considered together and in context to determine whether they affect the total mix of information and mislead a reasonable investor). Therefore, any representation by Nexity and its officer, Ken Vassey, regarding the possibility of an IPO is, as a matter of law, not material.
 v. Nexity's "Side Deal" with Institutional Investors
Finally, Blackmon argues that he presented substantial evidence indicating that Nexity offered a "side deal" to potential institutional investors to entice them to purchase stock. He argues (1) that the "side deal" was not offered to individual investors and (2) that the POM and the supplement did not disclose the "side deal." Blackmon bases this argument on the new factual allegation in the stricken amended complaint. The trial court properly did not address this argument, and we do not address it.[8] See Kaplan, 49 F.3d at 1370 (holding that the trial court properly *Page 1196 
refused to consider allegations in the amended complaints that were disallowed).
 IV. Conclusion
The trial court did not exceed its discretion in denying Blackmon's motion to amend his complaint. Further, the trial court did not err in entering a summary judgment against Blackmon and in favor of the Nexity defendants.[9] Therefore, we affirm the trial court's judgment.
AFFIRMED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] Blackmon testified at his deposition that he received the supplement at some point and that he reviewed it before delivering his executed subscription agreement and paying for the stock. He acknowledged the receipt of the supplement on June 2, 2000, by signing a notice attached to the supplement.
[2] Although Blackmon states in his brief that Nexity's 2001 annual report shows a net operating loss of $5,500,000 for the year 2000, Nexity's 2001 annual report is not included in the record. Thus, we rely on Blackmon's deposition testimony in the record that Nexity incurred a net operating loss of approximately $5,400,000 in 2000.
[3] Blackmon also sued Thomas A. Bryan, one of the original directors, but he later voluntarily dismissed his claims against this defendant.
[4] The trial court's order states, in pertinent part:
 "[Blackmon's] claim is based on the following misrepresentations:
 "(1) [Nexity's] financial performance;
 "(2) [Nexity's] anticipated IPO in 2000;
 "(3) extension of closing of offering until June 15, 2000;
 "(4) lowering the original minimum amount of the offering.
 "[Blackmon] alleges that he was told that Nexity was doing well and progressing per its model and the budget was on plan. [Blackmon] contends that in reality Nexity had lost $2.4 million in the year to date. However, the evidence before the Court is that Nexity had reported over $5 million in losses in the offering memorandum.
 "[Blackmon] also alleges that he was misled by an anticipated public offering. However, [Blackmon] admitted that he knew there may never be a public offering.
 "[Blackmon] makes the following contentions regarding the extension of the closing of the offering:
 "(1) The extension from May 30 to June 15 was to force investors to make a decision. However, [Blackmon] made his purchase on May 31 after the extension was made.
 "(2) Nexity would still raise the $15 million although the offering was lowered. [Blackmon] says he was told they had enough subscription agreements in hand or verbal commitments to meet the $15 million minimum. However, [Blackmon] was aware he could cancel or reduce his subscription and chose not to do so.
 "[Blackmon] also contends that Nexity offered a `side deal' to institutional investors. This was not a claim which was made in the original complaint and is not before the Court.
 "There were some statements made by defendants which could be characterized as `glowing' with regard to Nexity's future. . . . It appears to this Court that the `glowing' statements were within the proper limits of enthusiasm for a beginning venture.
 "The Court does not find any misrepresentations of a material fact as required by § 8-6-19(a), Alabama Code 1975.
 "Therefore, the Motion for Summary Judgment by all defendants is granted."
[5] The Private Securities Litigation Reform Act of 1995 renumbered § 12(2) of the Securities Act of 1933 as § 12(a)(2) of the Securities Act of 1933. Yung v. Lee,432 F.3d 142, 146 n. 3 (2d Cir.2005).
[6] Although this is how Blackmon summarizes the conversation with Lee in his brief to this Court, the actual language from the deposition transcript is: "The only thing I was told was that Nexity was doing well and that it was progressing as per their model or their budget on plan."
[7] Even if this argument could have been properly considered, Blackmon bases it on the minutes of the August 2000 meeting of Nexity's board of directors. The minutes reflect that, at the time of the August meeting, the board allowed the offering to continue until September 15, 2000. We are concerned, however, only with the materiality of misrepresentations that occurred at the time of sale or offer to sell. See §8-6-19(a)(2), Ala. Code 1975. Blackmon's argument fails to show that the Nexity defendants intended, at the time Blackmon purchased his stock, to extend the offering beyond June 15, 2000.
[8] Even if this argument could have been properly considered, Blackmon testified at his deposition that he did not know if this was relevant information and that he could not have purchased loan participations even if he had known about the deal. He testified that he simply would like to have known about the "side deal." Blackmon fails to show that the omission was material. "[T]here must be substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." TSC Industries,426 U.S. at 449, 96 S.Ct. 2126 (footnote omitted). In light of Blackmon's deposition testimony, the disclosure of this "side deal" would not appear to have significantly altered the "total mix" of information available to Blackmon.
[9] The Nexity defendants also argue that the applicable statute of limitations bars Blackmon's claims. Because we affirm the trial court's judgment on substantive grounds, we need not address this argument.